[No. 43797.    En Banc.    December 9, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. ANDREW JAMES WRIGHT, *Appellant*.

*Albert G. Lirhus* and *Fred H. Dore* (of *Dore & Dubuar*), for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *James J. Lamont, Senior Deputy,* for respondent.

UTTER, J.—Andrew James Wright was convicted in a jury trial of first-degree murder, while armed with a deadly weapon, in the death of his wife, Kathleen Wright. He urges reversal of this conviction on several grounds, including a claimed violation of due process by the destruction of numerous items of material evidence prior to trial. The destruction was undertaken by or at the direction of officers investigating the crime without consent of appellant or the superior court. Finding a serious breach of appellant's due process rights, we must reverse the conviction and dismiss the charges.

I

Appellant and his wife resided on the second story of a home owned by appellant's great grandmother, Mrs. Kupoff. In November 1974, the parents of Kathleen Wright filed a missing person report with the Seattle Police Department when it came to their attention that Kathleen was not to be found at her residence or place of employment. Proceeding to investigate this report, a Seattle Police Department detective spoke to Mrs. Kupoff who indicated she had not seen Kathleen Wright since October 20, 1974. Subsequent to that time, one of appellant's co-workers told the detective about a story to the effect that appellant had told his employer his wife had been killed in an automobile accident. The same detective also learned that Kathleen had not been to work for approximately 3 weeks and that appellant had been forging and cashing payroll checks.

The officer, accompanied by a homicide detective, returned to the Kupoff residence on November 21 to see if any of Kathleen's clothes were missing and to try to resolve conflicting stories concerning her disappearance. The second story of the house contained three bedrooms, a small bath, a small kitchen and a common room. In a small, locked

bedroom, the officers discovered a female corpse. The Wrights occupied living quarters separate from the bedroom where the body was found.[1]

The body lay on a bed, wrapped in blankets. Portions of the body were in an advanced state of decomposition and the hands were mumified. Facial features were, in large part, so distorted and decayed it was difficult to distinguish identifiable features. Maggots had infested both the body and the surrounding bed and bedclothes. The body was moved to the King County Medical Examiner's office for autopsy where the clothing was removed, itemized, and turned over to a Seattle Police Department detective. The items removed were a pair of blue socks, a pair of blue shoes, pantyhose, underwear, blouse, brassiere, and a pair of blue jeans. A police department sergeant, a criminologist, and a detective made the decision to destroy the evidence after it was released to them by the morgue, apparently because personnel in the police property room were reluctant to store the evidence. The testimony at trial indicated it would have been necessary to store the evidence in a small freezer in the property room and that, if the containing package broke, it would probably contaminate other evidence in the freezer.

No attempt was made to check for blood on any of the items before they were destroyed. There was no discussion about making the evidence available to the defense prior to its destruction or about renting another freezer to preserve the items. There was, however, no indication the evidence was destroyed with the intent of handicapping the defense.

After removal of the body, numerous items remained in the room where it was discovered. The blanket, pillowcase, and sheet the body was wrapped in, the blanket and mattress the body lay on, the rugs and pillows on the floor,

---

[1]Appellant, however, asserts a reasonable expectation of privacy in all of the second story of the house and argues that Mrs. Kupoff did not have authority to consent to the search of November 21, 1974. In light of our disposition of this appeal, we do not reach the Fourth Amendment issues.

and a man's coat found on a chair next to the body were all in the room. These items were destroyed by the stepfather of appellant, who obtained permission from the police before doing so. His purpose was to "clean the room up" for Mrs. Kupoff.

The destruction of the evidence took place while appellant was in custody and unrepresented by counsel. Once retained, appellant's counsel requested to see the evidence removed from the room where the body was found and was informed of its destruction. Prior to trial, appellant moved for "an order dismissing the charge of Murder One, and all lesser included offenses, on the grounds that he has been denied due process of law in that the state has suppressed material evidence by causing it to be destroyed and/or by allowing it to be destroyed by private parties."

Appellant's conviction was based in its entirety on circumstantial evidence. While there was evidence from which a jury could infer the defendant had, in fact, committed the crime, there was no confession and no eyewitness to the crime. The identity of the body was open to question. No dental comparisons or other tests which could confirm its identity were undertaken. The evidence was conflicting as to the identity of the bullets in the body. The time and date of the killing could not be determined precisely; it was estimated that death occurred sometime between October 29, 1974, and November 8, 1974. The place of death was not established nor was the method of killing certain. The deceased had three bullet wounds and a circular wound in the left superior chest.

## II

Due process imposes certain obligations on law enforcement and investigatory agencies to insure every criminal trial is a "search for truth, not an adversary game". *United States v. Perry*, 471 F.2d 1057, 1063 (D.C. Cir. 1972). One such constitutional obligation, the disclosure of evidence to the defendant, is well established. "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). *See Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972); *Seattle v. Fettig*, 10 Wn. App. 773, 519 P.2d 1002 (1974).

Under the rule governing suppression of evidence, the circumstances surrounding the nondisclosure, including the motivation of the party responsible for the suppression, are irrelevant. *See, e.g., Jackson v. Wainwright*, 390 F.2d 288, 295 (5th Cir. 1968); *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 571 (2d Cir. 1961). This is so because the constitutional requirement is "not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady v. Maryland, supra* at 87. The United States Supreme Court has not attempted to precisely define "material evidence" or the degree of prejudice which must be shown by the defendant to make out a violation. *See Giles v. Maryland*, 386 U.S. 66, 73-74, 17 L. Ed. 2d 737, 87 S. Ct. 793 (1967). Other courts have defined materiality quite broadly. *See, e.g., Levin v. Katzenbach*, 363 F.2d 287, 291 (D.C. Cir. 1966) (evidence which "might have led the jury to entertain a reasonable doubt about [the defendant's] guilt"); *Griffin v. United States*, 183 F.2d 990, 993 (D.C. Cir. 1950) ("evidence that may reasonably be considered admissible and useful to the defense"); *Curran v. Delaware*, 259 F.2d 707, 711 (3d Cir. 1958) ("pertinent facts relating to [the] defense"). Of course, neither the police nor the prosecution are to decide for the defense what is favorable or material evidence. *Cf. Barbee v. Warden*, 331 F.2d 842, 845 (4th Cir. 1964); *Griffin v. United States, supra* at 993. If the defense has established that the suppressed evidence is material, the court may conclude that due process has been denied and that the error can be corrected by a new trial at which the defendant will have full access to the evidence.

In cases like the one before us, however, the approach outlined above is not feasible. Here the suppressed evidence,

the numerous items found with the body in the upstairs room, has been destroyed. We therefore are unable to determine whether some or all of the evidence would have been favorable to the defendant and material to the issue of guilt or innocence.[2]

■ Several recent decisions are of assistance in determining what principles govern the resolution of a defendant's claim for relief where the evidence sought to be discovered no longer exists. These cases respond to the need, enunciated in *United States v. Bryant*, 439 F.2d 642, 644 (D.C. Cir. 1971), to prevent the subversion of the truth-finding process, so carefully monitored in its formal stages, by unreviewed government decision making in its informal stages. In *Bryant*, the court adapted the mandate of the suppression of evidence cases to situations in which the government has lost or destroyed potential evidence. The Court of Appeals for the District of Columbia Circuit observed, at page 648:

> Were *Brady* and its progeny applicable only when the exact content of the non-disclosed materials was known, the disclosure duty would be an empty promise, easily circumvented by suppression of evidence by means of destruction rather than mere failure to reveal. The purpose of the duty is not simply to correct an imbalance of advantage, whereby the prosecution may surprise the defense at trial with new evidence; rather it is also to make of the trial a search for truth informed by all relevant material, much of which, because of imbalance in investigative resources, will be exclusively in the hands of the Government.

The court found the crucial nature of the missing evidence, a tape recording of a conversation with the defendant, and the "unavoidable possibility" that the evidence might

---

[2]The trial judge concluded that "the discoverable . . . property is or would in fact be material." As we discuss, given the nature of the evidence destroyed, this is a very reasonable possibility. However, because the evidence is no longer in existence, it is impossible to make a factual finding as to the materiality or favorability of the specific evidence sought by appellant. *See People v. Hitch*, 12 Cal. 3d 641, 648, 527 P.2d 361, 117 Cal. Rptr. 9 (1974).

have been significantly favorable to the accused, brought the case within the protection of the due process clause. In order to render the duty to disclose an effective` obligation, *Bryant* held, at page 651, that "before a request for discovery has been made, *the duty of disclosure is operative as a duty of preservation."* (Italics ours.)

*Bryant* was followed in *People v. Hitch,* 12 Cal. 3d 641, 527 P.2d 361, 117 Cal. Rptr. 9 (1974), which involved the destruction of a recurring form of evidence, parts of an instrument used to determine intoxication. The court held those parts of the Breathalyzer which may be profitably retested prior to trial were material evidence on the issue of guilt or innocence of the charge of driving under the influence of alcohol, that due process requires such evidence be disclosed by the prosecution, and thus that the investigative agency has a duty to preserve the evidence for disclosure.[3] This holding was based on a determination that there was a "reasonable possibility" that the destroyed evidence was favorable to the defendant. *People v. Hitch, supra* at 649.

## III

The evidence sought by appellant in the present case was intimately related to the very existence of a homicide. A review of the entire record, considering not only the evidence of guilt but also other evidence of the defense, *see In re Ferguson,* 5 Cal. 3d 525, 533, 487 P.2d 1234, 96 Cal. Rptr. 594 (1971), makes it clear there was a reasonable

[3]Both *United States v. Bryant,* 439 F.2d 642 (D.C. Cir. 1971), and *People v. Hitch,* 12 Cal. 3d 641, 527 P.2d 361, 117 Cal. Rptr. 9 (1974), also held that "sanctions for nondisclosure based on loss of evidence will be invoked in the future unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence gathered in the course of a criminal investigation. The burden, of course, is on the Government to make this showing." (Italics omitted.) *United States v. Bryant, supra* at 652; *see People v. Hitch, supra* at 652-53. We resolve the present case without deciding whether such a remedy is to be imposed in the future. It is desirable that our consideration of such a rule be informed by extensive briefing by the parties and others interested and such is not available to us here.

possibility that the evidence destroyed by the police or at their direction was material to guilt or innocence and favorable to appellant.[4]

The defense argued that any one of three known individuals, other than the defendant, had the opportunity to have caused the death of Kathleen Wright. The great grandmother, Mrs. Kupoff, admitted to being in the room where the body was discovered on the date of Kathleen's disappearance. She stated that, in addition to the body, she found a gun and removed it from the room on that date. She concealed this fact until trial and concealed the existence of the body from everyone, including appellant, until its discovery by the police. A Mr. Morbeck had lived for 10 years in the small upstairs room, leaving 3 months before Kathleen's disappearance. He possessed a key to both the house and the bedroom where the body was discovered, which he returned after the police began their investigation. It was Morbeck's coat which was found in the room with the body. A next-door neighbor admitted to having been upstairs on or about the day Kathleen disappeared and had "psychic flashes" predicting her death prior to her disappearance.

The appellant enumerates nine areas where the existence of the evidence destroyed could possibly have been of assistance to him: (1) if Mr. Morbeck's coat had been examined and the blood of Kathleen Wright found on it, it could have pointed to him as the perpetrator of the crime; (2) had a knife been found in the pocket of the coat it could have been shown to be one of the weapons causing the death (Mr. Morbeck indicated he had lost his knife at about the time of the homicide); (3) the absence or presence of blood on the blanket or sheet would have been of assistance in determining whether the deceased was shot with or with-

---

[4]The duties of preservation and disclosure apply equally to the prosecution, police, other investigatory agencies, and persons who handle evidence with the consent of such officials. Cf. *United States v. Bryant*, 439 F.2d 642, 650 (D.C. Cir. 1971); *Barbee v. Warden*, 331 F.2d 842, 846 (4th Cir. 1964); *Imbler v. Craven*, 298 F. Supp. 795, 806-07 (C.D. Cal. 1969), *cert. denied*, 400 U.S. 865 (1970).

out the blanket and sheet around her; (4) clothing could have been helpful in identifying the body; (5) likewise, the shoes could have been helpful in identifying the body, and if a shoe size different from that of Kathleen Wright been discovered, a serious question would exist as to identity of the body; (6) the amount of dirt, oil, mud, or other substances on the shoes or clothing or items the body was wrapped in could have determined whether the girl was killed in the back room, front room, or some location entirely removed from the home; (7) had the sheet or blanket in which the body was wrapped had a laundry mark or other identifying mark, ownership of these items could have been established; (8) had the blouse the deceased was wearing been tested, it may have shown that blood other than that of the deceased was on it, indicating a struggle with her assailant and a possible clue to the identity of the assailant; (9) if there was blood, it may have been a type dissimilar to that of the defendant. These are some of the numerous insights that may have been gained by the defense—and the jury—but for the action of the police. The scope of this evidence and its proximity to the crime, we assume, would have been very helpful even to the prosecution in confirming many aspects of the State's theory of the case.

While good faith *loss* may excuse noncompliance with the duties of preservation and disclosure where the government makes "earnest efforts" to preserve crucial materials, *see United States v. Bryant, supra* at 651, *People v. Hitch, supra* at 652; this is not such a case. As previously noted, there is no suggestion that the evidence was destroyed for the purpose of hindering the defense. However, in destruction of evidence cases, as in true suppression cases to which they are closely analogous, the motive of those destroying the items is not determinative. The purpose of the duty of preservation is not to punish the police, but to insure a fair trial for the accused. *See Brady v. Maryland, supra* at 87. The motive of the authorities is of marginal relevance, except insofar as it raises an inference

that the evidence destroyed would be detrimental to the prosecution. *See People v. Hitch, supra* at 653 n.7. Here the destruction was intentional; no efforts were made to preserve the evidence. Because the items found in the locked upstairs room were in a condition which required freezing, one factor considered by the authorities was the limited size of their freezer. However, neither administrative convenience nor inadequate facilities, where it is not shown facilities could not be obtained, justifies a failure to preserve potential evidence.[5] *See United States v. Harrison*, 524 F.2d 421, 429 n.20 (D.C. Cir. 1975); *cf. United States v. Alsbrook*, 336 F. Supp. 973, 980 n.15 (D.D.C. 1971). "[T]here is no exception for good faith administrative decision[s] that certain evidence is not discoverable and thus need not be preserved." *United States v. Bryant, supra* at 652 n.21. Thus, in the circumstances of this case, the failure to preserve evidence from the Kupoff residence which, it is a reasonable possibility, was material and favorable to appellant, deprived him of due process.

## IV

The range of sanctions available in suppression and destruction of evidence cases should be broad and, of necessity, will be developed over time. *See generally* Comment, *Judicial Response to Governmental Loss or Destruction of Evidence*, 39 U. Chi. L. Rev. 542, 564-65 (1972). Trial and appellate courts are to be guided by the "pragmatic balancing approach," enunciated in *United States v. Bryant, supra* at 653, requiring a weighing of "the degree of negligence or bad faith involved, the importance of the evidence lost, and the evidence of guilt adduced at trial in order to come to a determination that will serve the ends of justice." *See United States v. Perry*, 471 F.2d 1057, 1065 (D.C. Cir. 1972). Given the serious violation of due process in this case, affirmance is unwarranted. Moreover, a new trial would do nothing to mend the constitutional deficiency. Thus ap-

---

[5] The burden imposed by this rule is greatly minimized by the procedure for notice to the defendant and petition to the court which we adopt for use in the future.

pellant's conviction must be reversed and the charges dismissed.

█ Looking to the future application of today's decision, we recognize that its rationale requires preservation of *all* potentially material and favorable evidence. A difficulty arises from the fact that an officer may not know what all such evidence is when he arrives at the scene of a crime. In addition, it may be virtually impossible to preserve every fragment of potential evidence. Note, *The Right to Independent Testing: A New Hitch in the Preservation of Evidence Doctrine*, 75 Colum. L. Rev. 1355, 1375-80 (1975). To alleviate these problems, before any testing or disposition of evidence occurs, the defendant should be given notice of the type of evidence involved and its planned disposition. If contact with the defendant is impossible or if the defendant is not yet represented by counsel, the state must petition the trial court which will determine an appropriate course of action consistent with the interests of both the prosecution and defense. *See United States v. Heiden*, 508 F.2d 898, 903 (9th Cir. 1974) (concurring opinion).

Judgment reversed and proceeding dismissed.

STAFFORD, C.J. and ROSELLINI, HUNTER, HAMILTON, WRIGHT, BRACHTENBACH, HOROWITZ, and DOLLIVER, JJ., concur.

WRIGHT, J. (concurring)—I concur in the majority opinion herein and have signed the same. I do, however, feel impelled to write a brief concurring opinion. The record in this case is extremely lengthy. The statement of facts is 2,018 pages in 7 volumes. For that reason it would obscure rather than clarify the matters I hope to discuss were I to quote extensively from the testimony.

This is a case of murder in the first degree and the result of the majority opinion will be that a defendant convicted by a jury will go absolutely free. In recent years there has been extensive criticism of the judiciary, especially of the appellate courts, because of freeing of obviously guilty persons on purely technical grounds.

This case, however, does *not* present such a situation. Here there is real doubt if the defendant is in fact the guilty person. The lack of proof of corpus delecti, or of venue will not be extensively discussed. It is one of the requirements of proof of murder that the identity of deceased be established. It is also a requirement in any criminal case that venue be proved. The proof of whose body was found is weak and there is no more than conjecture as to where the killing took place. The lack of proof on either of those items would justify a reversal. Those might, however, be classed as "technicalities."

My reason for writing this concurrence is to show that doubts in this case go far beyond what could reasonably be called "technicalities."

Several persons had opportunity to commit the crime. Mary Kupoff, great grandmother of defendant, testified that deceased tried to dominate her and she resented the attempted domination. There were many peculiarities in the testimony of Mrs. Kupoff. By her own testimony the only time in about 3 years she had been upstairs was on the day of the killing, which she said was Monday, October 21, 1974. Mrs. Kupoff stated positively the murder was committed on that Monday night. No one else could place the time the death occurred.

The only substantial evidence to connect defendant with the killing was a questionable comparison of markings on bullets found in the body with samples fired from a gun owned by defendant. Mrs. Kupoff admitted knowing where the gun was kept, and even returning it to that place after having found the dead body, all the while being careful not to put fingerprints on any part of the gun. She put it back because she said that was where it belonged. She had equal access to that gun with the defendant.

Mrs. Kupoff admitted she knew the body was in the back room. She told no one except her son who apparently thought she was talking of a fantasy and seemed to ignore her statements. She said she did not tell the police because they didn't ask her and because she was afraid she would

not get her pills. The last statement would seem to indicate she expected to be jailed if she mentioned finding the body. Finally, she made many strange and conflicting statements.

Dale Morbeck had formerly occupied the room where the body was found. He had a key to the room and to the building at the time of the killing and returned the key to Mrs. Kupoff later. He had formerly had a knife which he claimed to have lost about the time of the killing. With all of the evidence destroyed there was no way to know if death was from a stab wound in the chest or from the bullet wounds in the back. If the cause of death were in fact a stab wound, and the autopsy testimony indicated it could have been, then there was more reason to suspect Morbeck than to suspect the defendant.

Finally, the outside door was sometimes unlocked and the entire area was accessible to the public from the sidewalk. There was some testimony indicating that on one occasion, at least, a young male had come up the stairs with the obvious intention of having sexual relations with deceased.

Under the strange circumstances of this case, the destruction of evidence deprived defendant of a fair trial. Obviously, for the same reason, it will never be possible for defendant to have a fair trial. Under such circumstances it is a real substantial reason and not a technicality that requires a reversal.

STAFFORD, C.J., and HUNTER, BRACHTENBACH, and DOLLIVER, JJ., concur with WRIGHT, J.

Petition for rehearing denied May 5, 1977.