Edward Henry MALONEY, Appellant,

v.

STATE of Alaska, Appellee.

No. 6187.

Court of Appeals of Alaska.

Aug. 12, 1983.

Christine Schleuss, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Elizabeth H. Sheley, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

After a jury trial, Edward Maloney was convicted of manslaughter, in violation of AS 11.41.120(a)(1). Superior Court Judge Ralph Moody sentenced Maloney to twenty years' imprisonment; he suspended ten years of the sentence. Maloney appeals, challenging his conviction on several grounds and contending that his sentence is excessive. We affirm.

## I. FACTS

At approximately 5:30 p.m. on July 23, 1980, Maloney entered his Anchorage apartment and found the woman with whom he

was living, N.P., in bed with another man. Maloney beat up the man and threw him out of the apartment. He then assaulted N.P. After beating N.P., Maloney spent a short time cleaning his apartment, in an apparent effort to conceal signs of the assault. Maloney then left N.P. in the apartment and went downtown, where he spent the evening drinking with friends.

Maloney returned to his apartment sometime after midnight and found N.P. lying naked on the floor, between the bedroom and the bathroom. She was dead. One of Maloney's drinking companions called the apartment manager, who contacted the police. Police officers arrived at Maloney's apartment at about 3:00 a.m. and secured the area; a pathologist arrived to examine the scene at 4:30 a.m.

Investigating officers found Maloney's apartment in a state of disarray. Blood was spattered about the walls and the floor of the apartment and on various pieces of furniture. Officers found signs of Maloney's earlier efforts to clean up the apartment: a bloody newspaper was concealed under some magazines; bloodstained bed sheets were soaking in the bathtub; attempts had been made to wipe up blood from the bathroom floor; a pool of blood on the living room floor was covered by a rug; bloody clothes and papers had been stuffed into dresser drawers.

The pathologist examined N.P. and found that she had been severely beaten and had multiple bruises about the head and face. N.P.'s pelvic area, her genitals, and her inner thighs were also extensively bruised. In addition to the bruises, N.P. had several deep incision wounds on her face that were caused by a sharp object, but not a knife. There were a number of gouge wounds, also inflicted by a sharp instrument, on N.P.'s breasts. From his examination, the pathologist concluded that N.P. had bled to death from the incision wounds on her face or that she had choked on the blood from these wounds. The general disorder of the apartment and the fact that blood was found throughout led the pathologist to believe that N.P. was hit with great force,

that she lived at least two hours after being injured, and that she moved about the apartment a great deal after receiving her injuries. However, the pathologist was unable to form an opinion as to the precise time of N.P.'s death.

A search of Maloney's apartment indicated that an electric fan might have been used as a weapon by N.P.'s assailant. The base of the fan, constructed of high impact plastic, was covered with blood. A sharp, triangular shard of plastic broken away from the base of the fan was found in a trash basket with blood on it. In the opinion of the examining pathologist, this plastic shard was capable of causing the gouges and incised wounds that N.P. sustained. No other objects were found in Maloney's apartment that could have inflicted the injuries.

When initially contacted by police at his apartment, Maloney acknowledged beating N.P. but said that she was alive when he left to go out drinking earlier that night. Maloney's knuckles were extremely swollen, and there was blood on his clothing. Maloney was formally arrested shortly after police arrived at the apartment. Following arrest, Maloney made a number of spontaneous, inculpatory statements, including: "I did it," "now I'll be in jail forever," and "I don't know why I hit her so hard." Police subsequently interviewed Larry Sanders, one of the men who had been drinking with Maloney on the night of N.P.'s death. Sanders told police that during the evening Maloney mentioned beating N.P. and stated that he might have to go to jail for it. Maloney also told Sanders that N.P. might have to be hospitalized. When Sanders asked Maloney why he had not called an ambulance for N.P., Maloney did not reply.

Based on the evidence found at Maloney's apartment and on the statements made by Maloney at the scene of N.P.'s death, Maloney was indicted for second-degree murder and was tried on this charge.

At trial, Maloney's defense was predicated on the theory that an unknown assailant—possibly seeking money—had entered his apartment and fatally injured N.P. after

Maloney had beaten her and gone drinking with his friends. Maloney testified in his own defense and admitted being in a rage and attacking N.P. However, he denied inflicting the injuries that caused N.P.'s death and insisted that he had used nothing other than his fists during the assault. According to Maloney, his assault caused only a bloody nose and a single cut on N.P.'s head. Maloney stated that after beating N.P., he felt sorry for her and apologized, and the two made up. He said that he then helped N.P. stop the cut on her head from bleeding and cleaned up the apartment. Maloney also claimed that, before leaving the apartment to go drinking, he offered to take N.P. to a hospital and have the cut on her head treated. According to Maloney, N.P. declined, saying that she did not need medical help.

In support of his defense, Maloney presented three friends as witnesses; all testified that Maloney was drinking with them at downtown Anchorage bars continuously from about 6:30 p.m. until early the next morning, when Maloney returned home. Larry Sanders also testified that he had given N.P. a large sum of money to keep for him several days before her death and that a number of people were aware that N.P. had been given this money. Finally, a neighbor testified on Maloney's behalf. She stated that at about 10:00 p.m. on the night of N.P.'s death she heard loud noises from Maloney's apartment, followed by the angry voice of a man and the crying voice of a woman, pleading with the man to leave her alone; more loud noises followed.

Upon completion of trial, the jury returned verdicts acquitting Maloney of second-degree murder but convicting him of manslaughter, a lesser-included offense.

## II. DISMISSAL OF INDICTMENT FOR MATERIAL MISSTATEMENT OF FACT

■ Maloney first contends that the superior court erred in denying his pretrial motion to dismiss his indictment on the ground that material misrepresentations of fact were made to the grand jury. Malo-

ney's indictment was partially based on the testimony of his arresting officer, Arvid Bjornton, to whom Maloney made a number of statements. The following exchange between Bjornton and the prosecutor occurred before the grand jury and is the subject of Maloney's challenge:

Q: All right. Did you have further conversation with Mr. Maloney at the scene?

A: Yes, I did. When I first contacted Mr. Maloney I asked him to remain in the hall area until I came back out ... and once I had notified our dispatch that there was in fact a body at the scene, I went out and contacted Mr. Maloney and asked him if he knew what had happened there. He told me that he lived in apartment 204 and he had found the deceased lady, [N.P.], with another man earlier in the evening and that he had gotten mad at both of them and beat them both up. And I asked Mr. Maloney when he had seen [N.P.] alive last and he told me that when he left she was laying [sic] on the bed, that he had beaten her up and that just prior to him leaving he had tried to clean up the mess in the apartment and then he told me—when—just went on to tell me that he had beaten both [N.P.] and the other male—he didn't—know the other man's identity or where he went afterward and that he didn't think that [N.P.] was in that bad of condition. *However, he returned some time later to find [N.P.] laying [sic] on the floor in the position that I found her and he went on to tell me that he just got very made and he beat her up and beat him up.*

Q. Did he say anything contradictory concerning how badly he beat her up?

A: He didn't think—he told me he didn't think that she was in that bad of condition when he left. In other words, he said that he knew he had beat her up and he—he—but he didn't think that she was in—that bad off when he left .... [Emphasis added.]

This testimony by Officer Bjornton prompted the following question from an unidentified grand juror:

Q: When did—when you got there and you were talking to him did he say what time he had left after he had beat them up that first time—or that time?

Maloney contends that Bjornton's testimony created the incorrect impression that Maloney admitted assaulting N.P. on two separate occasions. He supports this contention by pointing out the apparent confusion on the part of the grand juror who questioned Bjornton about the "first time" that N.P. was beaten. Maloney claims that, because of its potential importance on the issue of whether he acted in heat of passion, this incorrect testimony constituted a material misrepresentation and that, therefore, he should have been entitled to dismissal of his indictment.

Upon consideration of the grand jury testimony, we conclude that Officer Bjornton's testimony cannot fairly be characterized as a material misrepresentation. Although the challenged passage of Bjornton's testimony is certainly ambiguous at first glance, a more careful consideration makes it sufficiently clear that the testimony was not meant to indicate that Maloney physically assaulted N.P. on two separate occasions during the night of July 23. Significantly, Bjornton stated that, "he [Maloney] just got very mad and beat her up and beat him up." Since the testimony specifically refers to the beating Maloney inflicted on both N.P. and the man who was found in bed with her, it could logically constitute a reference only to the original encounter involving Maloney, N.P. and the other man. Thus, when considered in context, Officer Bjornton's statement, "he [Maloney] returned some time later to find [N.P.] laying on the floor . . . and he went on to tell me that he just got very mad and beat her up and beat him up . . .", while awkwardly phrased, appears to indicate only that, after telling Officer Bjornton how he had found N.P.'s body at the apartment, Maloney repeated his explanation of the circumstances surrounding the assault that had occurred when Maloney returned home in the late afternoon of July 23 to find N.P. in bed with another man.

Moreover, we do not think that the single question posed to Officer Bjornton by the grand juror is sufficient to indicate any substantial degree of confusion as to the number of times Maloney was alleged to have assaulted N.P. Although the juror asked about the "first time" that Maloney beat up N.P., the question was immediately rephrased so that it referred to a single episode of assault. Thus, the juror asked in relevant part: "[D]id [Maloney] say what time he had left after he had beat them up that first time—*or that time*?" (emphasis added). Judge Moody, in ruling on Maloney's motion below, found that the question posed by the grand juror was in effect self-correcting. We agree with Judge Moody's finding. Taken in its entirety the question indicates that, after beginning the question, the juror realized that the "first time" language was inappropriate; the manner in which the question was rephrased adequately alerted the other jurors to this fact.

In short, we do not think that the possibility of misinterpretation by the grand jury of Officer Bjornton's testimony is so great that it constitutes a material misrepresentation of fact. With the exception of the single, superficially ambiguous statement, nothing in the testimony of Officer Bjornton or of any other grand jury witness intimated the possibility that Maloney committed two separate assaults on N.P. The prosecutor who presented the case to the grand jury made no statements or arguments to suggest such a possibility. In ruling on Maloney's motion to dismiss prior to trial, Judge Moody properly considered the challenged grand jury testimony in light of the totality of the evidence presented to the grand jury. He concluded that the possible ambiguity was not likely to have affected the grand jury's decision. We agree with Judge Moody's conclusion. In the absence of any showing that the grand jury's deliberations were affected by the challenged portion of Bjornton's testimony, Maloney's motion to dismiss was properly denied. *McMahan v. State,* 617 P.2d 494, 500–01 (Alaska 1980), *cert. denied,* 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121

(1981); *Keith v. State,* 612 P.2d 977, 981 (Alaska 1980); *Miller v. State,* 629 P.2d 546, 547–48 (Alaska App.1981).

## III. FAILURE TO PRESERVE EVIDENCE

Maloney next alleges that police officers who investigated the scene of N.P.'s death failed to preserve material evidence that could potentially have been favorable to his defense. Maloney complains that loss of evidence by the state violated his right to a fair trial, as guaranteed by the due process clauses of the United States and Alaska constitutions.[1]

This claim involves a number of items of physical evidence that investigating officers either took into evidence and subsequently lost or failed to collect as evidence at all. Most prominent among the items is the plastic shard that was probably used as the fatal weapon, the electric fan from whose base the plastic shard was broken, a hunk of hair that was discarded in a trash basket located in the bathroom of Maloney's apartment, and fingernail clippings that were taken from Maloney upon arrest. Maloney also objects to the failure to examine and test N.P.'s hands and fingernails for traces of hair, blood or skin, and he maintains that a number of other articles of evidence should have been preserved and made available for independent examination.[2]

With respect to these articles, Maloney points out that the state is required by constitutional due process to disclose all material evidence potentially favorable to the accused. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). He goes on to emphasize that, prior to disclosure, the state's constitutional obligation is operative as a duty to preserve evidence.

*United States v. Bryant,* 439 F.2d 642 (D.C. Cir.1971); *Putnam v. State,* 629 P.2d 35, 43–45 (Alaska 1980); *Lauderdale v. State,* 548 P.2d 376, 382 (Alaska 1976). Maloney also cites a number of cases holding that evidence potentially favorable to the defense must be considered material for the purpose of defining the scope of the prosecutor's duty if its disclosure "might have led the jury to entertain a reasonable doubt about the defendant's guilt." *Williams v. State,* 629 P.2d 54, 64 (Alaska 1981), quoting *Wyrick v. State,* 590 P.2d 46, 46 n. 1 (Alaska 1979); *Catlett v. State,* 585 P.2d 553, 557 (Alaska 1978). Maloney submits that the evidence which the state failed to preserve in this case might have created a reasonable doubt as to his guilt and that he is, therefore, entitled to a reversal of his conviction and to a dismissal of the charge against him.

The handling of evidence by police in this case was, in fact, less than exemplary.[3] We nevertheless conclude that Maloney has failed to establish a violation of his constitutional right to due process. We believe that the particular circumstances of this case do not entitle Maloney to relief based merely on a showing that certain evidence could possibly have created a reasonable doubt as to guilt if it had been preserved and disclosed. Application of a higher standard of materiality is required in this case. The federal and Alaska cases upon which Maloney relies uniformly adhere to a broad definition of materiality and require no more than a showing that evidence lost or destroyed by the state might have created a reasonable doubt as to the defendant's guilt. However, in each of these cases a timely pretrial request for disclosure of evidence was made by the defense.[4] We be-

1. U.S. Const. amend. V; Alaska Const. art. 1, § 7.

2. The record concerning the handling and disposition of the various articles of evidence in question is restricted to testimony presented at trial. Since no pretrial evidentiary hearings were held on the issue of failure to preserve evidence, the record on appeal is rather sketchy as to the precise timing and circum-

stances surrounding the examination, seizure and loss of various items.

3. *Torres v. State,* 519 P.2d 788, 797 (Alaska 1974) (police have an affirmative duty to "promulgate regulations and systematic procedures to preserve all evidence obtained in the course of an investigation").

4. The same is true of a Washington Supreme Court decision heavily relied upon by Maloney.

lieve that the existence of a timely pretrial request for disclosure is a significant factor distinguishing the cases relied upon by Maloney from his own case.

Here, not only did Maloney fail to make a pretrial request for preservation or disclosure of any of the evidence that is the subject of his claim, but he also failed to request disclosure of any of the information during presentation of the state's case-in-chief at trial. Nor did Maloney timely assert the state's failure to preserve evidence by objecting to the admission of any evidence concerning the crime scene when it was presented by the state. In fact, no request for disclosure was ever made by the defense in this case. The issue of the state's failure to preserve evidence surfaced for the first time in the form of a motion to dismiss, made by Maloney's trial counsel after all evidence had been presented and when final argument to the jury was about to begin.

We believe that in cases such as Maloney's the presence or absence of a timely request for disclosure of potentially favorable evidence can play a critical role in determining the standard by which the state's constitutional duty to preserve and disclose evidence should be measured. Early United States Supreme Court cases dealing with the prosecution's duty to disclose favorable defense evidence presupposed the existence of a timely request for disclosure. Thus, for example, in *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218, the United States Supreme Court described the prosecution's duty in the following manner: "Suppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the

evidence is material either to guilt or to punishment . . . ." (Emphasis added.) Indeed, the question whether due process would ever require the prosecution to disclose evidence to the defense without a request, of its own accord, was first reached by the United States Supreme Court only recently, in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). In *Agurs,* the Supreme Court expressly held that an individual's right to a fair trial, as guaranteed by the due process clause of the fifth amendment, affirmatively requires the prosecution to disclose material evidence favorable to the defense even when no request for disclosure has been made. *Id.* at 107–13, 96 S.Ct. at 2399–2402, 49 L.Ed.2d at 352–55.[5]

At the same time, however, the Court in *Agurs* recognized that, in the absence of a timely request for disclosure, a different standard of materiality should be applied than the standard adopted in cases involving a timely request. *Agurs* identified two types of cases that the Supreme Court had previously considered in decisions dealing with the prosecution's duty to disclose evidence potentially favorable to the accused. First were cases in which the prosecution failed to disclose information tending to show that evidence against the accused was based on perjured testimony. The second type of case involved failure by the prosecution to disclose evidence favorable to the accused despite a timely request for disclosure of the specific information withheld. As to these two types of cases, *Agurs* held that the materiality of evidence withheld by the prosecution should be measured by a broad standard: whether there is a reasona-

In *State v. Wright,* 87 Wash.2d 783, 557 P.2d 1 (1976), a case factually very similar to Maloney's, the court reversed the defendant's murder conviction based on the state's failure to gather and preserve physical evidence located at the scene of the murder. A timely pretrial request for disclosure of the evidence was made by defense counsel in *Wright;* it was this request that served as the basis for the court's reversal.

**5.** On appeal, the state has strenuously argued that Maloney waived his right to argue the due

process issue because he failed to make a timely request for disclosure and failed to move for dismissal prior to his omnibus hearing. The state's brief on appeal does not refer to or cite *Agurs.* We think that the United States Supreme Court, by holding in *Agurs* that the prosecution is, under certain circumstances, required to disclose evidence favorable to the accused even when no request for disclosure is made, has precluded a holding that Maloney has completely forfeited his right to assert the due process issue.

ble likelihood that the undisclosed evidence might have affected the judgment of the jury or the outcome of the trial. *Id.* at 103–05, 96 S.Ct. at 2397–98, 49 L.Ed.2d at 349–50. Yet the Court in *Agurs* expressly refused to apply this same broad standard of materiality in cases where no perjured testimony was involved and no pretrial request for disclosure of evidence favorable to the accused was made.[6]

Instead, *Agurs* adopted a substantially more stringent test of materiality for the purpose of determining when a prosecutor violates due process by failing to disclose voluntarily, in the absence of any request, evidence potentially favorable to the accused. The Court held that in such cases speculation as to the possible effect of evidence on the jury's verdict is uncalled for and that a constitutional violation occurs only when the accused demonstrates that the prosecution failed to disclose evidence that actually does, in the context of the case, create a reasonable doubt as to guilt:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt

about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. at 112–13, 96 S.Ct. at 2401–02, 49 L.Ed.2d at 354–55 (footnotes omitted).

We believe that application of the narrow standard of materiality adopted in *Agurs* is appropriate here.[7] Maloney did not assert his due process claim until after all the evidence at his trial had been presented. Virtually all of the physical evidence that Maloney now contends should have been preserved for his benefit was photographed by the state. Under Alaska's broad rules of criminal discovery, Maloney had the right to pretrial examination of the state's photographs, of all other physical evidence in the possession of the state, and of all police and expert witness reports concerning such evidence. *See* Alaska R.Crim.P. 16(b)(1)(v). Thus, prior to trial, Maloney should have been well aware of the nature of the evidence found by police at the crime scene. He should have been able to determine what evidence had been tested, and he should have been capable of requesting that specific evidence be made available for his own independent testing.

At no time, either on appeal or below, has Maloney argued that he was not aware prior to his trial of the potential importance of evidence such as the plastic shard, the

**6.** After discussing the role of a defense request in defining the prosecution's constitutional duty to disclose potentially favorable defense evidence, the Court in *Agurs* further held that a proper request for disclosure must be specific in nature. Thus, the Court concluded that a general request for disclosure, such as a request for "all exculpatory evidence," must be deemed to be the equivalent of no request at all. *United States v. Agurs,* 427 U.S. at 106–07, 96 S.Ct. at 2398–99, 49 L.Ed.2d at 351–52.

**7.** It is unnecessary for us to decide whether the narrow *Agurs* standard of materiality should be adopted under the Alaska Constitution's due process clause in all cases where no timely and specific request for disclosure has been made. This is an issue that has not previously been addressed by the Alaska Supreme Court or by

this court. We note that Justice Marshall, joined by Justice Brennan, dissented from the Supreme Court's opinion in *Agurs,* arguing that the standard of materiality created by the majority decision was unjustifiably severe and unduly rigid. 427 U.S. at 114, 96 S.Ct. at 2402, 49 L.Ed.2d at 356 (Marshall, J., dissenting). We are concerned that harsh results might be obtained by an across-the-board application of the narrow *Agurs* standard to all such cases. Furthermore, application of the narrow *Agurs* standard might be particularly problematical in cases of bad faith destruction where the accused and his counsel could not reasonably have been aware that the state possessed exculpatory evidence and were thus precluded from making a timely request for disclosure.

electric fan from which it came, the hunk of hair in the trash, or his own fingernail clippings. Nor has Maloney ever offered to make a showing excusing or justifying his failure to make a pretrial request for production or testing of the various items that he contends were crucial to his defense.[8] Although it appears from the record that some of the evidence dealt with by Maloney was never actually secured by investigating officers (e.g., the electric fan), the most significant items of evidence sought by Maloney were in fact taken into evidence and were disposed of sometime thereafter. A timely request by Maloney for production or testing of these items might well have prevented their eventual loss. Even as to those items that were not collected as evidence, a timely motion to dismiss, based on the prosecution's failure to preserve, would have resulted in development of a substantially more accurate and more informative record concerning the potential evidentiary value of the evidence and the circumstances surrounding the state's failure to preserve it. Moreover, under these circumstances, we cannot ignore the possibility that the timing of Maloney's claim that the state had failed to preserve and disclose potentially exculpatory evidence was the product of a tactical decision.

 These considerations warrant application of the *Agurs* standard of materiality to the present case. In applying the narrow *Agurs* standard, we must consider the potentially exculpatory evidence in the context of the totality of the evidence presented, and we must ask whether it is sufficient to create a reasonable doubt as to Maloney's guilt that did not otherwise exist. None of the evidence in question affirmatively indicated the presence or participation of another person in the killing of N.P. Similarly, Maloney has failed to show any specific circumstances that could support a conclusion that any item of lost evidence was likely to yield proof of participation by a third party if it had been preserved for independent testing. Any conclusion that the evidence might have yielded such proof would be entirely speculative. We conclude that the unpreserved evidence in this case fails to create a reasonable doubt as to Maloney's guilt.[9] Accordingly, we hold that

**8.** We recognize that Maloney's trial counsel did request an evidentiary hearing after making his motion to dismiss; that request was denied by Judge Moody. A reading of the record makes it clear, however, that Maloney's counsel sought to have the hearing for the sole purpose of establishing that police were aware of the potential relevance of the evidence that they failed to preserve. Cf. *Nicholson v. State,* 570 P.2d 1058, 1064 (Alaska 1977) (investigating officers are not required to collect and preserve crime scene evidence when its relevance cannot reasonably be foreseen at the time of the investigation). At the time Maloney's counsel moved for dismissal, he made no attempt to explain or justify his failure to raise the due process issue in a timely manner. In response to the state's argument that Maloney waived his right to argue the due process issue by failing to raise it prior to his omnibus hearing, Maloney has offered, in his reply brief on appeal, to establish that he was unaware of the state's failure to preserve evidence until after the omnibus hearing. Significantly, though, Maloney has not offered to show that he was unaware of the state's alleged violations prior to trial, and has made no attempt to justify his failure to request disclosure prior to either the omnibus hearing or trial.

**9.** Implicit in our decision is the further conclusion that a defendant who unjustifiably fails to make a timely request for disclosure of exculpatory evidence must bear the burden of establishing its exculpatory nature if, after an untimely application, it is learned that the evidence was not preserved. This burden is contrary to the burden in cases where a timely request for disclosure is made. See *Putnam v. State,* 629 P.2d 35, 44 n. 18 (Alaska 1980). It appears clear, however, that in creating the narrow standard of materiality applicable to cases in which no pretrial request for disclosure of evidence favorable to the accused is made, the court in *Agurs* intended the burden of establishing materiality to be borne by the accused. The court stated, in relevant part:

> [T]he judge should not order a new trial every time he is unable to characterize a nondisclosure as harmless under the customary harmless-error standard. Under that standard when error is present in the record, the reviewing judge must set aside the verdict and judgment unless his "conviction is sure that the error did not influence the jury, or had but very slight effect." *Kotteakos v. United States,* 328 U.S. 750, 764 [66 S.Ct. 1239, 1248], 90 L.Ed. 1557 [1946]. *Unless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant.*

Maloney's right to due process was not violated by the failure to preserve this evidence.

## IV. DENIAL OF RIGHT TO CONFRONTATION

█ Maloney separately argues that the state's failure to preserve evidence violated his right to confront and cross-examine the evidence against him. *Lauderdale v. State,* 548 P.2d 376 (Alaska 1976). He complains that photographs showing objects such as the electric fan, a bloody palm print on the apartment wall, and the hunk of hair in the trash were used as evidence against him at trial, but that the evidence shown in the photographs was not preserved. Maloney contends that the failure to preserve this evidence precluded effective cross-examination concerning objects depicted in the photographs. We find no merit to this argument.

When the various photographs and all of the testimony relating to the photographs were admitted at trial, Maloney failed to object on confrontation grounds. He similarly failed to request that items depicted in the photographs be produced for use as evidence instead of the photographs. Thus, to the extent that Maloney's confrontation clause argument is not disposed of by our holding with respect to his due process claim, we conclude that the confrontation issue has not properly been preserved for appeal. *See* A.R.E. 103(a)(1).

## V. SUFFICIENCY OF EVIDENCE AT TRIAL

Maloney further attacks his conviction on the ground that the trial court erred in denying motions for judgment of acquittal that he made during trial; a similar contention is raised as to the trial court's denial of

a motion for a new trial that Maloney made after the jury reached its verdict. These motions were all based on Maloney's claim that the evidence at trial was insufficient.

█ In considering the sufficiency of evidence at trial for the purpose of determining if a motion for a judgment of acquittal should have been granted, we must view the evidence and all the inferences therefrom in the light most favorable to the state and determine whether fair-minded jurors could differ on the issue of whether proof was established beyond a reasonable doubt. *See Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981); *Siggelkow v. State,* 648 P.2d 611, 613 (Alaska App.1982). Here, given the number and nature of N.P.'s wounds, the manner in which they were apparently inflicted, Maloney's explanation at the scene of the crime concerning the circumstances under which he attacked N.P., and Maloney's outright admission, "I did it," which was made when Maloney had already seen the wounds on N.P.'s body after her death, we conclude that there was ample evidence to allow the charge of second-degree murder to be submitted to the jury.

█ A different standard of review applies to the trial court's denial of a motion for a new trial. Unlike the situation with a motion for judgment of acquittal, when a motion for a new trial is made on the basis that the jury's verdict is contrary to the weight of the evidence, the trial court may properly take into consideration the credibility of witnesses. On appeal, our review of a trial court's ruling on a motion for a new trial is limited to deciding whether the trial judge has abused his discretion. *Dorman v. State,* 622 P.2d at 454; *Amidon v. State,* 565 P.2d 1248, 1262 (Alaska 1977). Particularly in cases where credibility of witnesses is significant, we must give broad

*United States v. Agurs,* 427 U.S. at 111–12, 96 S.Ct. at 2401–02, 49 L.Ed.2d at 354. (Emphasis added.)

In its most recent decision on the subject, the United States Supreme Court expressly extended its holding in *Agurs* to a case involving failure to preserve evidence. *United States v. Valenzuela-Bernal,* —— U.S. ——, ——, 102 S.Ct. 3440, 3449–50, 73 L.Ed.2d 1193, 1205–07

(1982). In *Valenzuela-Bernal,* the court refused to impose sanctions against the government after witnesses potentially favorable to the accused were deported from the United States. The court specifically held that the accused must bear the burden of establishing that the deported witnesses would have been capable of providing material evidence favorable to the defense. *Id.*

deference to the trial judge's ability to observe the demeanor of witnesses, to form a firsthand impression of their credibility, and to decide the weight that should be given to their testimony.

█ In the present case, Maloney's defense at trial and his argument in support of a new trial both depended to a large extent on his own credibility as a witness and on the credibility of the witnesses who were called by him to support his defense theory. Judge Moody had the opportunity to hear and see the testimony of Maloney and his witnesses. We think that Judge Moody was well within the scope of his discretion in deciding that Maloney and other defense witnesses lacked credibility and that the verdict returned by the jury was not contrary to the weight of the evidence. We thus find no error in Judge Moody's denial of Maloney's motion for a new trial.

## VI. SENTENCE APPEAL

█ Maloney's final point on appeal concerns his sentence, which he contends is excessive. Despite the fact that Maloney was a first felony offender with a relatively minor record of misdemeanors, Judge Moody sentenced him to a maximum term of twenty years' imprisonment; ten years of the sentence was suspended. Maloney argues that, given the provocation involved prior to his assault on N.P., his first-offender status, and his amenability to rehabilitation, the sentence he received is not justified.

Although Maloney's sentence is a severe one for a first felony offender, the appropriateness of the sentence must be evaluated not only in light of Maloney's background, but also in light of the facts involved in this particular case. Despite the existence of some provocation, Maloney's assault on N.P. must be ranked among the most vicious and brutal incidents of criminal violence. As shown by the extensive injuries to N.P.'s breasts and pelvic region, Maloney's assault was in essence a sexual one, and it involved unmistakable elements of deliberate cruelty. Furthermore, Maloney's calculated and callous departure from

his apartment after the assault, without summoning medical assistance, must be considered particularly egregious. Maloney literally abandoned N.P. to a slow and horrifying death.

Maloney's conduct is unquestionably among the most serious within the definition of the offense of manslaughter, a crime which, itself, is among the most serious crimes of violence. The high value placed on human life and dignity by our law mandates imposition of a sentence clearly reflecting society's condemnation of Maloney's act and adequately deterring Maloney and other potential offenders from committing similar acts of violence in the future. In a case such as this, we think that these sentencing goals may properly be given greater emphasis than the goal of rehabilitating the offender. We hold that the sentence imposed by Judge Moody is not clearly mistaken. *See Notaro v. State*, 608 P.2d 769 (Alaska 1980); *Hughes v. State*, 513 P.2d 1115 (Alaska 1973); *Van Cleve v. State*, 649 P.2d 972 (Alaska App.1982); *Nelson v. State*, 619 P.2d 480 (Alaska App. 1980).

The conviction and sentence are AFFIRMED.