[No. 9087–9–I. Division One. February 7, 1983.]

THE STATE OF WASHINGTON, *Respondent,* v. LARRY W. JONES, ET AL, *Appellants.*

*Allen Ressler* and *John Wolfe,* for appellants.

*Norm Maleng, Prosecuting Attorney,* and *Dennis Nollette, Deputy,* for respondent.

SWANSON, J.—Larry Wayne Jones was convicted by a jury of first degree escape while armed with a deadly weapon and a firearm and first degree assault while armed with a deadly weapon. William Dennis Dunne was convicted by the same jury of first degree escape while armed with a deadly weapon and a firearm, possession of a machine gun, and auto theft. They appeal alleging: (1) the trial court erred by not granting their motion to dismiss their first trial because the prosecutor failed to comply with discovery orders; (2) their second trial violated constitutional provisions prohibiting double jeopardy; (3) the trial court erred in refusing to grant their motion for a mistrial or dismissal in the second trial; and (4) they received inef-

fective assistance of counsel. We affirm.

The charges against defendants arose out of the October 14, 1979, escape of seven inmates from the King County Jail. Briefly, with respect to the escape charges, the evidence showed both defendants were accomplices of the escapees—they supplied and drove the two escape vehicles. With respect to the assault charge against Jones, the State presented evidence showing Officer Alexander was shot three times by the driver of a brown Mustang. Jones was identified as the driver of the Mustang immediately after the shooting, and Jones stated in a hospital after the shooting: "I'd like to give a message to Officer Alexander. Nothing personal, you know, I just tried to give him three of my best ones."

With respect to the auto theft and possession of a machine gun charges against Dunne, there was testimony showing he had been in a stolen red Mustang with the escapees. After the car crashed, Dunne was found nearby with ammunition clips. The car, later inventoried, contained, among other items, an AR 15 semiautomatic rifle.

The appeal in this case arose out of discovery matters. The first trial of defendants ended in a mistrial ordered by the trial judge because of numerous failures by the State to adhere to the judge's discovery orders. A second trial began approximately 60 days later. Although during the first trial it was determined that the police had recorded their radio transmissions during the escape, and had also produced an edited tape version, the defendants did not request the tapes until the start of the second trial. The State subsequently produced the edited tapes, mistakenly stating the verbatim tapes did not exist.[1] Over 2 weeks into the second

---

[1]The prosecutor explained at trial how the mistake occurred: "MR. NOLLETTE: Your Honor, I would like to put a couple of things on the record. The first is an apology to the Court. I apparently misled the Court and counsel earlier in the course of this trial with regard to the manner in which the 911 and radio tapes were recorded. I previously informed the Court that the tapes, the originals of the tapes were void. In fact, that is not true.

"I can understand how the confusion developed, because apparently the pro-

trial near the close of the State's case, the State provided the verbatim tapes. The trial judge gave the defense a week to review the tapes and prepare. Jones' trial attorney, after reviewing the tapes, said he could not properly structure his defense without a new trial. He stated the new information would have altered his cross examination of numerous prior state witnesses, and perhaps changed the defendants' theory of the case. The trial court denied the defense motion to dismiss. Both defendants' trial attorneys, stating they were unprepared, refused to participate in any further examination of witnesses, the preparation of jury instructions, or closing arguments.

Defendants first assign error to the trial court's granting of a mistrial instead of a dismissal of the first trial. They contend that because the court rule governing sanctions for violating discovery orders does not explicitly include granting a mistrial, the trial court here was precluded from imposing that sanction. We disagree.

 CrR 4.7(h)(7)(i) allows the trial court to declare a mistrial because of a party's failure to comply with discovery orders. The rule reads:

> If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an

---

cedure which was followed was that, from the large 16–track tape which is used to record all transmissions, a series of cassettes, apparently eight or ten were made by the Communications Department for the use of Mr. Homan. Those eight or ten cassettes were reduced to the two cassettes introduced previously which have been provided to counsel.

"When I asked Detective Homan, I believe I phrased my question in such a way that—I asked something like, 'Where is the tape from which these tapes were made?' He said they were destroyed, and indeed those eight or ten cassettes have been destroyed. . . .

". . .

"My concern is that those eight or ten cassettes have been destroyed, so I was not misleading the Court about that. But apparently the 16–track large tape does still exist, and I informed counsel this morning. Obviously they have not had the opportunity to hear it. I think they are entitled to hear it. If they so desired, I think I would not oppose a recess called for that purpose.

"Again, I accept full responsibility for this confusion and all I can do is apologize to everyone involved."

> order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, dismiss the action or *enter such other order as it deems just under the circumstances.*

(Italics ours.) The broad language of the rule allowing the court to impose "such other order as it deems just under the circumstances" refutes defendants' position. That language allows the trial court to impose sanctions not specifically listed in the rule. *See State v. Glasper,* 12 Wn. App. 36, 39, 527 P.2d 1127 (1974). Furthermore, the granting of a mistrial has been expressly recognized as a sanction available under CrR 4.7(h)(7)(i). *State v. Falk,* 17 Wn. App. 905, 908, 567 P.2d 235 (1977). The trial court had discretion to declare a mistrial.

The defendants next assert that the second trial violated constitutional provisions prohibiting repeated prosecutions for the same offense. We conclude the defendants' second trial did not violate their constitutional rights.

■ The double jeopardy clause of the fifth amendment to the United States Constitution and article 1, section 9 of the Washington Constitution proscribe multiple prosecutions. Although the general rule is that the State has only one opportunity to require the accused to stand trial, a retrial is not automatically barred when the court declares a mistrial. *Arizona v. Washington,* 434 U.S. 497, 505, 54 L. Ed. 2d 717, 98 S. Ct. 824 (1978). In determining the constitutionality of a second trial after a mistrial, courts distinguish between mistrials declared with or without defendant's consent. *United States v. Dinitz,* 424 U.S. 600, 608, 47 L. Ed. 2d 267, 96 S. Ct. 1075 (1976). Thus we must initially determine whether defendants consented to the mistrial in this case.

Under the test established for determining whether the defendant consented to a mistrial for the purpose of the double jeopardy clause, the defendants consented here. In ascertaining whether defendants consented to a mistrial,

> '[t]he important consideration, for purposes of the Dou-

ble Jeopardy Clause, is that the defendant retain primary control over the course to be followed . . .

(Footnote omitted.) *Dinitz,* at 609. In this case, both defendants expressly agreed to the mistrial before the trial court granted it. They retained the power to continue or stop the trial. They consented to the mistrial.

Where defendants consent to a mistrial, the appropriate test to determine if a second trial is barred is whether the prosecutor's conduct was motivated "in bad faith in order to goad the respondent into requesting a mistrial or to prejudice his prospects for an acquittal." *Dinitz,* at 611. The defendants here do not contend the State's failure to supply discovery was motivated by bad faith, and the trial court found no willful violations on the part of the State. Courts in other jurisdictions have found similar prosecution conduct unintentional, allowing a second trial. *See, e.g., United States v. Leonard,* 593 F.2d 951 (10th Cir. 1979); *People v. Collins,* 48 Ill. App. 3d 643, 362 N.E.2d 1118 (1977); *State v. Copening,* 100 Wis. 2d 700, 303 N.W.2d 821 (1981). Under the applicable test, the constitutional provisions do not bar the second trial here.

Defendants also claim the trial court erred by failing to dismiss or grant a mistrial in the second trial because of the State's failure to provide the verbatim police tapes at the start of the second trial. We do not agree.

"It is well established that . . . withholding of evidence violates due process if the evidence is favorable to a defendant and material to his case." *State v. Boyd,* 29 Wn. App. 584, 587, 629 P.2d 930 (1981). The courts have articulated two materiality tests, depending on whether the defendant makes a specific or general request for evidence. *United States v. Agurs,* 427 U.S. 97, 104, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). Because of the disparity between the materiality tests, it is important to determine whether the request for the tapes here was specific or general.

The request here should be characterized as specific. "A 'specific request' is one giving the prosecutor . . . 'notice of exactly what the defense desired.'" *Boyd,* at 589. In this

case the defense gave the prosecution notice of exactly what was desired, the originals of the tapes. At the start of the first day of jury selection for the second trial, the defense requested the tapes without specifically mentioning either the verbatim or edited tapes. A few days later during a discussion arising out of another request for the tapes, the State's attorney stated the original tapes did not exist, indicating he knew what the defense wanted. In addition, the State volunteered the information that the original tapes were, in fact, available, also indicating the State was aware the defense requested the verbatim tapes. The defendants' request was sufficiently specific.

Because defendants' request was specific, the test to determine materiality is whether the evidence "might have affected the outcome of the trial." *Agurs,* at 104. This "might have affected" the outcome test "is equivalent to the 'reasonable possibility' standard of materiality employed by our Supreme Court in *State v. Wright,* [87 Wn.2d 783, 557 P.2d 1 (1976)]." *Boyd,* at 588.

A number of considerations support our conclusion that there was no reasonable possibility that the outcome of the trial would have been affected by the timely receipt of the verbatim tapes by the defense. Initially, we recognize that the defense received the edited tapes near the start of the second trial, and eventually received the verbatim tapes with a week to prepare; this is not a situation in which the defense never received the evidence. Furthermore, we note the conduct of the defense attorneys indicates they placed little importance on the verbatim tapes until the prosecutor disclosed he had made a mistake and they were available. The defense knew about the availability of the verbatim tapes for approximately 2 months prior to the start of the second trial, but never requested them before the trial. After the prosecution initially stated the verbatim tapes were not available, the defense did not protest. The actions of the defense suggest the verbatim tapes were of minor importance. Most importantly, although Jones' trial attorney claimed the verbatim tapes disclosed new material

information, including the existence of eyewitnesses and potential suspects in the area Alexander was shot, in light of the overwhelming evidence against the defendants, we conclude there was no *reasonable* possibility that earlier availability of the verbatim tapes to the defense would have affected the trial's outcome. We therefore hold that the verbatim tapes were not material and defendants' due process rights were not violated by the belated disclosure of the evidence.

The final issue is whether defendants were denied effective assistance of counsel. We conclude they were not.

 Washington courts on numerous occasions have stated the test for showing ineffective assistance of counsel: "After considering the entire record, can it be said that the accused was afforded an effective representation and a fair and impartial trial?" *E.g., State v. Jury,* 19 Wn. App. 256, 262, 576 P.2d 1302 (1978).

> This test places a weighty burden on the defendant to prove two things: first, considering the entire record, that he was denied effective representation; and second, that he was prejudiced thereby.

*Jury,* at 263.

We first conclude defendants were not denied effective representation. Where counsel's actions involve trial tactics, the courts have declined to find constitutional violations. *E.g., State v. Ermert,* 94 Wn.2d 839, 849, 621 P.2d 121 (1980). The decision by defendants' trial attorneys[2] here, not to examine or call witnesses, or give closing arguments is best depicted as tactical. Washington courts have held the decision not to call witnesses is a matter of trial strategy. *E.g., State v. Thomas,* 71 Wn.2d 470, 472, 429 P.2d 231 (1967); *State v. Floyd,* 11 Wn. App. 1, 2, 521 P.2d 1187 (1974). The fact that trial counsels' conduct was intentional also indicates trial tactics were involved. As another court stated recently:

> [Conscious unprofessional conduct and involuntary inep-

---

[2]Defendants had different counsel on appeal.

titude] should be kept distinct even though admittedly both may prejudice the client. To equate the two would provide an improper incentive to use unprofessional conduct as a means to secure mistrials or reversals of convictions having as the end the delay of a valid conviction or the possible escape from prosecution.

(Footnotes omitted.) *United States v. Altamirano,* 633 F.2d 147, 150–51 (9th Cir. 1980). In addition, the record shows trial counsel represented defendants zealously during the many weeks of the two trials before they decided to cease functioning, and that defendants acted as cocounsel during the trial. Finally, we note the trial judge characterized counsels' conduct as strategic. All these factors indicate defendants had effective representation.

Secondly, we note defendants fail to demonstrate, or even allege, prejudice because of counsels' actions. Thus examination under either prong of the test articulated in *Jury* shows the defendants received effective assistance of counsel.

Finally, we wish to express our disapproval of trial counsels' conduct in this case. The language of the Code of Professional Responsibility, EC 7–20 and EC 7–22, is pertinent:

> In order to function properly, our adjudicative process requires an informed, impartial tribunal capable of administering justice promptly and efficiently according to procedures that command public confidence and respect. Not only must there be competent, adverse presentation of evidence and issues, but a tribunal must be aided by rules appropriate to an effective and dignified process. The procedures under which tribunals operate in our adversary system have been prescribed largely by legislative enactments, court rules and decisions, and administrative rules. Through the years certain concepts of proper professional conduct have become rules of law applicable to the adversary adjudicative process. . . .
>
> . . .
>
> Respect for judicial rulings is essential to the proper administration of justice; however, a litigant or his lawyer may, in good faith and within the framework of the law, take steps to test the correctness of a ruling of a tribunal.

Merely because a trial judge rules against an advocate's position does not justify refusing to further participate in the proceedings. Our legal system has long–standing procedures for dealing with alleged trial court error. The conduct displayed by the attorneys here is not such a procedure. Such conduct disserves the court and our system of justice. We consider it inappropriate and unprofessional.

We affirm the judgments.

ANDERSEN, C.J., and CORBETT, J., concur.

Reconsideration denied March 10, 1983.

Review denied by Supreme Court May 10, 1983.