IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  46775-5-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JAMES BROWN, JR., | |
| Appellant. | |

BJORGEN, C.J. — A jury returned verdicts finding James Brown guilty of second degree assault and fourth degree assault.  The jury also returned special verdicts finding that Brown committed the second degree assault while armed with a deadly weapon and that he committed the fourth degree assault against a member of his family or household.  Brown appeals his convictions and resulting sentence, asserting that (1) the prosecutor committed misconduct by asking him to comment on the credibility of witnesses, (2) his defense counsel was ineffective for (i) failing to object to the prosecutor's questions asking him to comment on the credibility of witnesses, (ii) failing to object to the prosecutor's question implying that he had an obligation to speak with police, and (iii) failing to object to witness testimony that Brown contends commented on his credibility, (3) the trial court violated his right to appointed counsel by failing to inquire into the breakdown of the attorney-client relationship, and (4) the trial court erred at sentencing by ordering him to pay discretionary legal financial obligations (LFOs) without first inquiring into his ability to pay those obligations.

We affirm Brown's conviction, reverse the imposition of discretionary LFOs, and remand for the trial court to make an individualized inquiry into Brown's ability to pay before imposing

any discretionary LFOs, consistently with *State v. Blazina*, 182 Wn.2d 827, 839, 344 P.3d 680 (2015) and former RCW 10.01.160(3) (2010).

## FACTS

In 2014, Brown and Naomi Oligario were in a dating relationship and had an 8-year-old daughter in common. Oligario also had three older children, including her 17-year-old son, RJ.[1] On June 25, 2014, Brown went to Oligario's home to drop off the couple's daughter.[2] Oligario believed that Brown had been drinking alcohol while he was out with their daughter, and she asked Brown to speak with her outside of the house. Oligario gave Brown a sandwich that she had made for him, and the two went outside to talk. After Brown and Oligario began arguing, Brown threw the sandwich at Oligario's face. In response, Oligario pushed Brown. While pushing Brown, Oligario slipped and fell to the ground. Oligario then called out for RJ.

RJ ran outside and began arguing with Brown. Brown grabbed a pickaxe and, according to RJ and Oligario, ran toward RJ and swung the pickaxe at him. Oligario grabbed Brown's legs and bit him, causing Brown to lose control of the pickaxe. Brown and RJ continued to argue, and Brown grabbed a wooden cross. When Brown approached RJ while holding the wooden cross, Oligario put Brown in a choke hold until he calmed down. Police arrived and, after speaking with the parties, arrested Brown. The State thereafter charged Brown with second degree assault with a deadly weapon sentence enhancement and fourth degree assault with a domestic violence sentence enhancement.

The following exchange took place before trial:

---

[1] This opinion uses the juvenile victim's initials to protect his interest in privacy.

[2] According to Oligario, Brown had been living at the house until a couple weeks earlier but moved away after a previous altercation with her. According to Brown, he was residing at the home at the time of the incident.

> [Defense counsel]: Your Honor, I want to mention to the court, Mr. Brown says that I did not call witnesses for him at this time. I want to allow him a chance to speak to the court if he wants to about that.
>
> [Brown]: I do have witnesses. He didn't bring it to my attention and let them know how I wanted to go back in because he was there when everything was going on. And I was wondering why he didn't come and question me about it, how to get in touch with him. He never did do that to me. So I was wondering why I ain't got to [sic] witnesses up here and going to trial, everything is so fast. I don't know what's going on here. I'm just popping up and going to trial. I ain't got no understanding about nothing about what's going on here.
>
> [Trial court]: Okay. Well, Mr. Brown, I'll let you bring that up with [defense counsel]. You can discuss whether or not you want to call a witness. We can re-address that if it looks like you're going to want to be calling a witness. [Defense counsel] can discuss that with you. And we can address whether or not there's any issues created by that.
>
> At this point, that's between the two of you to discuss and to work out.
>
> [Brown]: Okay.
>
> [Trial court]: But Mr. Brown, you've had a number of court appearances where this date has been told to you as your court date. In fact, you had a date not too long ago where the State asked to continue the trial date where you objected wanting your trial to go forward, and the court allowed the continuance. So this shouldn't be too much of a surprise to you that you're up for trial today.
>
> [Brown]: Okay.

Report of Proceedings (RP) at 12-13.

The following day, the trial court held a CrR 3.5 hearing to determine the admissibility of Brown's statements to the police. At the conclusion of the CrR 3.5 hearing defense counsel conceded, and the trial court found, that Brown's pre-*Miranda*[3] statements to police were made voluntarily in a noncustodial setting. The trial court thus concluded that Brown's statements to police were admissible at trial.[4] After the trial court ruled on the admissibility of Brown's statements, defense counsel stated to the trial court:

> My investigator actually was able to track down the witness Mr. Brown was referring to. His name is Harold J. Jones. From what I just spoke to my investigator about, the report he'll be filing with me, we will not be calling Mr. Jones as a

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Brown does not assign error to the findings of fact and conclusions of law entered following the CrR 3.5 hearing.

3

witness for the defense. I've explained this to Mr. Brown and made my reason clear to him. I wanted to put that on the record.

RP at 38. Brown did not raise any issue with his defense counsel's decision not to call his requested witness and did not raise any other issue with his counsel's representation throughout the course of the trial.

At trial the State called Oligario and RJ, who testified consistently with the facts as stated above. The State also called Kitsap County Sheriff's deputies Victor Cleere and Mark Gundrum. Both deputies testified that they did not immediately start making arrests at the scene because they needed to speak with the parties to investigate whether a crime had occurred. Regarding his interactions with Brown, Cleere testified as follows:

| | |
|---|---|
| [Cleere]: | Basically Mr. Brown was, I would say, semi-cooperative. He seemed to be a little bit worked up. I was asking him what was going on. He was telling me that they had tussled, but he wouldn't be specific about what was happening. Basically had to ask him numerous times, you know, what had happened, trying to get a chronological story of what was going on. And I wasn't really getting a straight story from him. The story was changing quite a bit. |
| [State]: | What do you mean, the story was changing? |
| [Cleere]: | I asked him, you know: Did they fight? He said, "Well, I didn't hit her." "Did you push her?" "Well, no, she fell down." I asked what the fight was about. At first it was about [RJ] disrespecting him, and then later it turned into something about driving the daughter while he was intoxicated, things like that. The story just kept moving around, it just wasn't . . . |
| [State]: | Were you interested in getting his side of what happened? |
| [Cleere]: | Yeah, I wanted to know from his side what had happened. You know, obviously there was some sort of dispute there, and I just wanted to get his story, which wasn't forthcoming. |
| . . . . | |
| [State]: | And what did he say about the pickaxe? |
| [Cleere]: | I believe he said that [RJ] was coming after him and he picked it up to protect himself. |
| [State]: | So at that point, did you want to know some of the details? |
| [Cleere]: | Right, yeah. I wanted to know why would he want to protect himself from [RJ], why was [RJ] coming after him. There wasn't much to |

go on. The story obviously had a lot of holes in it. It didn't make a lot of sense to me.

[State]: Did you try to get details out of him?

[Cleere]: Yes, I did.

[State]: How long do you think you talked to him?

[Cleere]: Several minutes.

[State]: How many times do you think you asked him specifically what happened?

[Cleere]: At least 12 times.

[State]: Did he seem to understand the questions?

[Cleere]: Yes. He seemed to understand the questions. He was talking to me. He was talking about a lot of stuff. But, I mean, he was not getting specific about what happened between him and the female and her son, which is [RJ]. He just, basically he would minimize it, say that they tussled. That doesn't really specifically tell me what happened.

RP at 133-35. Gundrum similarly testified about his interactions with Brown, stating that Brown was "vague" and "ambiguous" about the incident. RP at 145-46.

Brown testified in his defense. Brown admitted to throwing a sandwich at Oligario's face. Brown also admitted to picking up a pickaxe, but claimed that he did so in self-defense. In claiming self-defense, Brown did not testify that RJ had used, attempted to use, or threatened to use force against him. Instead, Brown testified that he grabbed the pickaxe at the moment that Oligario called out for RJ and RJ came running out of the house. Brown stated that he feared for his life when RJ came running out of the house because RJ was "quick and strong." RP at 161. Brown also stated that he knew RJ "was going to be ready to do something" because that is how a son would act "[w]hen a parent calls for help." RP at 168. Brown denied that he had swung the pickaxe at RJ, stating that Oligario caused him to drop the pickaxe shortly after he had grabbed it.

The following exchange took place during the State's cross-examination of Brown:

[State]: And you've had good relationships with [Oligario and RJ], right?

[Brown]: Yes.

. . . .

5

[State]: . Were you surprised they were willing to talk to the police and surprised they were willing to come in and testify?

[Brown]: You know, like I said, [Oligario], she is a very nice person and she [is] truthful about what she do. She's trying to raise her kids like that. I wouldn't put it out that she wasn't going to come and speak up. That's the way she is. She was raised like that to tell the truth and have her kids tell the truth. That's what I admire about her.

[State]: Knowing that that's what she does, she tries to tell the truth, you must be upset that she would make up a story and [RJ] would make up stories about what happened that night.

[Brown]: You know something, I can look at something and you ask me how did it—how did it go? I couldn't tell you just exactly how—I can be looking at something, I can see you make a move, I couldn't even do the same way you do, you know what I'm saying? I know everybody's story is not going to meet up, but it's going to be close. I know they going to say what they want to say, and I'm going to say it the way I saw it.

[State]: Right, So different people see a situation, everybody is going to describe it a little different.

. . . .

[State]: Would you agree with me your story of what happened that night is dramatically different from what everybody else described?

[Brown]: It's not dramatically different. It's related to what was going on, you know what I'm saying? They—they didn't put everything out there because they want to maybe shut out things. I put it right out there what was all about. Maybe she didn't want to come up and say my son might be disrespecting me, this and that. She might not want to bring that up.

RP at 200-02. Defense counsel did not object to this line of questioning.

The jury returned verdicts finding Brown guilty of second degree assault and fourth degree assault, and it returned special verdicts finding Brown committed the second degree assault while armed with a deadly weapon and committed the fourth degree assault against a member of his family or household.

Prior to his sentencing hearing, Brown filed a letter with the trial court that requested an "immediate appeal" based on his defense counsel's ineffective assistance. CP at 99. Brown's letter stated that his defense counsel failed to defend him at trial and failed to call his requested witness to testify. Brown's letter further requested a sentence at the bottom range, a new trial, or

a plea to a lesser charge.  Brown's letter did not request that the trial court appoint him substitute counsel to represent him at his sentencing hearing.

At the sentencing hearing, the trial court addressed Brown's letter, stating that his defense counsel had filed a notice of appeal, that it appeared to the court that defense counsel was a good advocate, and that it would deny Brown's request to set aside the jury's verdict.  The sentencing court thereafter imposed a standard range sentence based on Brown's offender score of 6.  The sentencing court also imposed LFOs, to which Brown did not object.  Brown appeals his convictions and sentence.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT

Brown first asserts that his convictions must be reversed based on the prosecutor's misconduct in asking him to comment on Oligario's and RJ's credibility.  We disagree.

A defendant claiming prosecutorial misconduct must show both improper conduct and resulting prejudice.  *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009).  Prejudice exists when there is a substantial likelihood that the misconduct affected the verdict.  *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).  Because Brown did not object at trial to the prosecutor's conduct that he complains of on appeal, he must further demonstrate that the misconduct was "so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice" that was incurable by a jury instruction.  *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).

Here the State concedes that the prosecutor committed misconduct by asking Brown whether he was upset that Oligario and RJ "would make up stories about what happened that night."  RP at 201.  We accept the State's concession.  *See State v. Ramos*, 164 Wn. App. 327,

334, 263 P.3d 1268 (2011) (A prosecutor commits misconduct by asking a defendant whether another witness is lying.). However, the State contends, and we agree, that Brown has failed to make the required showing that the prosecutor's misconduct was so flagrant and ill-intentioned that the resulting prejudice was incurable by a jury instruction.

Unprompted by any improper questioning by the State, Brown testified that Oligario was a "truthful" person and that she had raised her children to "tell the truth." RP at 200-01. Having already testified that Oligario was truthful and that she had raised RJ to be truthful, any prejudice resulting from the prosecutor's follow-up questions to Brown regarding Oligario's and RJ's credibility was minimal and could have been cured with a jury instruction. Accordingly, Brown has not shown reversible error based on the prosecutor's misconduct. *Stenson*, 132 Wn.2d at 719.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Brown asserts that his defense counsel was ineffective for (1) failing to object to the State's questions asking him to comment on Oligario's and RJ's credibility, (2) failing to object to the State's question that implied he had an obligation to speak with police, and (3) failing to object to portions of Cleere's and Dundrum's testimony that he contends improperly commented on his credibility. We disagree.

To prevail on an ineffective assistance of counsel claim, Brown must show both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Brockob*, 159 Wn.2d 311, 344-45, 150 P.3d 59 (2006). Performance is deficient if, after considering all the circumstances, it falls below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice results if there is a

reasonable probability that the outcome of the trial would have been different had defense counsel not rendered deficient performance. *State v. Grier*, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011), *cert. denied*, 135 S. Ct. 153 (2014). We strongly presume that counsel is effective and Brown must show the absence of any legitimate strategic or tactical reason supporting defense counsel's actions. *McFarland*, 127 Wn.2d at 336-37. To rebut this presumption, Brown bears the heavy burden of "establishing the absence of any '*conceivable* legitimate tactic explaining counsel's performance.'" *Grier*, 171 Wn.2d at 42 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

A.    Brown's Testimony

1. Credibility

Brown first asserts that defense counsel was ineffective for failing to object to the State's questions asking him to comment on Oligario's and RJ's credibility. However, as discussed above, Brown's initial testimony regarding Oligario's and RJ's tendencies to be truthful was not prompted by any improper questioning by the State. Thus, it is conceivable that defense counsel chose not to object to the State's follow-up questions to allow Brown to explain why their account of the events differed from his account. Defense counsel's decision not to object permitted the jury to hear Brown's explanation that Oligario and RJ may have perceived the event differently than he had. Had defense counsel objected to the State's follow-up questions, the jury may have been left only with Brown's testimony that Oligario was truthful and had raised RJ to be the same. Accordingly, we hold that defense counsel had a legitimate tactical reason for not objecting to the State's questioning, which defeats Brown's ineffective assistance of counsel claim. *Grier*, 171 Wn.2d at 42.

2. Right to Silence

Next, Brown asserts that his defense counsel was ineffective for failing to object to the State's question, "So when the deputies came to you, you knew all you had to do was tell the truth," which he contends improperly asked him to comment on his Fifth Amendment right to silence. RP at 193; U.S. CONST. amend. V. We disagree.

A comment on the right to silence occurs when evidence of the defendant's silence is used to the State's advantage as either substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt. *State v. Lewis*, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). "The use of pre-arrest silence as substantive evidence of guilt implicates the Fifth Amendment and is not merely an evidentiary issue." *State v. Easter*, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996). However, if the defendant testifies at trial and claims self-defense, the State may use a defendant's pre-arrest silence to impeach the defendant's self-defense claim. *State v. Burke*, 163 Wn.2d 204, 213, 217, 181 P.3d 1 (2008) (citing *Jenkins v. Anderson*, 447 U.S. 231, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980)).

Here, Brown did not exercise his right to pre-arrest silence, and he testified at trial that his conduct against RJ was taken in self-defense. Accordingly, when viewed in context, the State's question to Brown did not ask him to comment on exercising his right to silence when police officers spoke to him but, rather, asked him to explain why he did not assert the same self-defense claim to which he had just testified at trial when he chose to speak with police officers on the day of the incident. Moreover, even assuming for the sake of argument that the State's question asked Brown to comment on his pre-arrest silence, such use of Brown's silence was permissible as impeachment evidence under *Burke*. 163 Wn.2d at 217. At most, the State's question was designed to impeach Brown's self-defense claim to show how the claim had

10

evolved over time and was not designed to elicit substantive evidence of his guilt. Accordingly, Brown cannot demonstrate that his defense counsel performed deficiently for failing to object to the State's question. Therefore, Brown's claim of ineffective assistance on this ground cannot succeed.

B.    Cleere's and Dundrum's Testimony

Next, Brown asserts that defense counsel was ineffective for failing to object to portions of Cleere's and Dundrum's testimony, which testimony Brown contends included improper comments on his credibility. Again, we disagree.

Generally, witnesses are not permitted to testify about their opinions of the defendant's credibility. *State v. Demery*, 144 Wn.2d 753, 759, 30 P.3d 1278 (2001). Impermissible opinion testimony about the defendant's credibility "unfairly prejudices the defendant because it invades the exclusive province of the jury to make an independent determination of the relevant facts." *State v. Rafay*, 168 Wn. App. 734, 805, 285 P.3d 83 (2012) (citing *State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007)). "Testimony from a law enforcement officer regarding the veracity of another witness may be especially prejudicial because an officer's testimony often carries a special aura of reliability." *Kirkman*, 159 Wn.2d at 928. However, testimony based on "direct knowledge of facts at issue" rather than on "one's belief or idea" does not constitute opinion testimony. *Demery*, 144 Wn.2d at 760 (internal quotation marks omitted). Additionally, "testimony that is not a direct comment on the defendant's guilt or on the veracity of a witness, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony." *City of Seattle v. Heatly*, 70 Wn. App. 573, 578, 854 P.2d 658 (1993).

Here, neither Cleere nor Dundrum testified as to their opinions regarding Brown's credibility. Instead, they merely stated their observations of Brown's responses to their

11

questions about what had transpired between him, RJ, and Oligario. There was nothing improper about this testimony because it was based on the officers' direct observations of Brown's conduct in answering their questions at the scene and, thus, did not invade the province of the jury to determine whether Brown was a credible witness.

### III. DISSATISFACTION WITH APPOINTED COUNSEL

Next, Brown asserts that the trial court abused its discretion by failing to adequately inquire about the breakdown of his relationship with defense counsel. We disagree.

Indigent defendants have a Sixth Amendment right to appointed counsel at all critical stages of a criminal prosecution. *State v. Harell*, 80 Wn. App. 802, 804, 911 P.2d 1034 (1996). Sentencing is a critical stage of a criminal prosecution. *State v. Robinson*, 153 Wn.2d 689, 694, 107 P.3d 90 (2005). A defendant wishing to discharge his appointed counsel must make a timely motion to do so upon proper grounds. *State v. Cross*, 156 Wn.2d 580, 606, 132 P.3d 80 (2006). Trial strategy, including the decision to call witnesses, is a matter within the discretion of counsel. *Cross*, 156 Wn.2d at 606-07; *State v. Jones*, 33 Wn. App. 865, 872, 658 P.2d 1262 (1983). Thus, a defendant's disagreement with counsel over the decision to call or not to call a witness generally does not create a conflict raising Sixth Amendment concerns. *Cross*, 156 Wn.2d at 609.

Brown did not file any motion to discharge his counsel or to have substitute counsel appointed. Absent such a motion, Brown cannot demonstrate that the trial court abused its discretion by failing to inquire into his alleged conflict with counsel. Further, because Brown's issue with his defense counsel concerned only counsel's decision not to call a witness, a matter of trial strategy, he did not present any valid basis for the trial court to appoint new counsel. Accordingly, Brown's argument on this issue lacks merit.

IV. LEGAL FINANCIAL OBLIGATIONS

Finally, Brown asserts for the first time on appeal that the trial court erred by imposing LFOs without first considering whether he had the present or likely future ability to pay the LFOs as required under *Blazina*, 182 Wn.2d 827. In *State v. Lyle*, 188 Wn. App. 848, 850, 355 P.3d 327 (2015),[5] *remanded*, 365 P.3d 1263 (2016), the majority opinion held that a defendant sentenced after we issued our decision in *Blazina*, 174 Wn. App. 906, 301 P.3d 492 (2013), *remanded*, 182 Wn.2d 827 (2015), waives this challenge by not raising it in the trial court.

Brown did not challenge the trial court's preprinted finding that he had the ability pay LFOs at his October 10, 2014 sentencing hearing that occurred after our decision in *Blazina*. Under the majority opinion in *Lyle*, Brown's failure to challenge the trial court's LFO finding would generally result in his waiver of the issue on appeal. However, in light of our Supreme Court's recent order granting the petition for review in *Lyle*, 365 P.3d 1263, and remanding to the trial court on the LFO issue presented there, we elect to exercise our discretion whether to reach challenges to discretionary[6] LFO's when not raised in the trial court.

Here, there was no discussion of Brown's ability to pay discretionary LFOs at his sentencing hearing. The State, however, points to Brown's statement at sentencing that he "work[s] hard" and to his request for a low-end sentence so that he "can get back out to my work

---

[5] Bjorgen, A.C.J., dissented.

[6] Brown challenges both discretionary and mandatory LFOs, relying solely on *Blazina* and former RCW 10.01.160(3), the statute on which *Blazina* rests. *Blazina*, however, only addressed discretionary LFOs in imposing its requirement for an individualized determination of ability to pay. 182 Wn.2d at 832, 837. Therefore, Brown's argument that his mandatory LFOs are subject to the requirement of an individualized determination fails. In addition, we held in *State v. Mathers*, No. 47523-5-II (Wash. Ct. App. May 10, 2016) that mandatory LFOs imposed for the deoxyribonucleic acid (DNA) fee and the Victim Penalty Assessment (VPA) fee are not subject to the requirement of an individualized determination.

and deal with my [nine] kids," as support for a finding that he has the ability to pay the imposed LFOs. RP (Oct. 10, 2014) at 7-8. Brown's statement that he "work[s] hard," while suggesting that he has been employed in the past and is likely employable, does not reveal Brown's past or potential future income or his necessary living expenses. RP (Oct. 10, 2014) at 7. Accordingly, we cannot conclude on these statements alone that the trial court had a sufficient factual basis to impose discretionary LFOs absent the individualized inquiry required in *Blazina*.

The trial court found Brown indigent at the conclusion of the proceeding. Although a trial court's indigency finding does not necessarily show an inability to pay in all situations, our Supreme Court recognized in *Blazina* that if a defendant meets the GR 34 standard for indigency, "courts should seriously question that person's ability to pay LFOs." *Blazina*, 182 Wn.2d at 839. At the least, this recognition shows that the need for an individualized inquiry into ability to pay is heightened under *Blazina* when the defendant is indigent. In *Blazina* the court remanded for an individualized determination, even though the defendants had not objected below, because it found that the pernicious consequences of "broken LFO systems" on indigent defendants "demand" that it reach the issue. 182 Wn.2d at 830, 833-34. Those same consequences face Brown, another indigent defendant. Although his present indigency does not necessarily mean that Brown is or will be unable to pay his LFOs, it does mean under *Blazina* that the trial court must assess his ability to pay in the individualized manner the Supreme Court requires. The trial court failed to make that individualized determination. Accordingly, we exercise our discretion and remand to the trial court for reconsideration of the discretionary LFOs consistently with former RCW 10.01.160(2)-(3) and *Blazina*, 182 Wn.2d at 838-39.

V. APPELLATE COSTS

Brown filed a supplemental brief contending that if the State substantially prevails in this appeal, we should decline to impose appellate costs on him because he is indigent and is serving a substantial sentence. The State responded that it does not intend to file a cost bill in this matter, regardless of the outcome. Holding the State to its representation, Brown's challenge to appellate costs is moot and need not be considered.

CONCLUSION

We affirm Brown's conviction, reverse the imposition of discretionary LFOs, and remand for the trial court to make an individualized inquiry into Brown's ability to pay before imposing any discretionary LFOs, consistently with *Blazina*, 182 Wn.2d at 839 and former RCW 10.01.160(2)-(3).

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____, C.J.
BJORGEN, C.J.

We concur:

_____
MELNICK, J.

_____
SUTTON, J.