IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of D.C. | ) ) ) | No. 78496-0-I |
| STATE OF WASHINGTON, | ) ) ) | DIVISION ONE |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| D.C., | ) ) ) | |
| Appellant. | ) | FILED: July 29, 2019 |

SCHINDLER, J. — D.C. seeks reversal of the 90-day order of commitment for involuntary treatment. D.C. contends his attorney provided ineffective assistance of counsel and insufficient evidence supports finding he was gravely disabled under RCW 71.05.020(22). Because the record does not support his argument, we affirm.

Initial Detention

On April 9, 2018, a King County designated mental health professional filed a petition for initial detention of D.C. The petition alleged that as the result of a mental disorder, D.C. was gravely disabled. Psychiatrist Dr. Manal Khan filed a declaration in support of the petition. Dr. Khan states D.C. "was brought to the UWMC [(University of Washington Medical Center)] [Emergency Department] after being found down at [the University of Washington] Bookstore covered in feces, urine, vomit and bed bugs." D.C.

had a "concerning . . . elevated white blood cell count" and a bowel obstruction. Dr. Khan described D.C. as follows:

> On presentation, patient is agitated, disorganized, impulsive, and responding to internal stimuli. His mentation is clearly altered (patient is neither oriented nor can track conversation). He has been intermittently and unpredictively agitated and non-adherent with treatments/ interventions. This has necessitated four point restraints.

Petition for 14-Day Involuntary Treatment

On April 10, 2018, the UWMC and Dr. Janice Edwards filed a petition for a 14-day involuntary treatment order alleging D.C. was gravely disabled. Dr. Edwards asserts:

> In the hospital [D.C.] continues to be confused and disorganized. He has no self[-]care plan and insists the he needs to stay in the hospital for surgery (which is not the case). He says that he is not sure that he will take psychiatric medications because the hospital is giving him some "fake" medications. He has no realistic self-care plan.
>
> . . . .
>
> . . . [T]here are no less restrictive alternatives to detention in the best interest of [D.C.] or others because: **he is not compliant with treatment**.[1]

On April 11, 2018, a superior court commissioner entered an order committing D.C. for involuntary treatment for 14 days. The findings of fact state, "[A]fter consultation with counsel, [D.C.] voluntarily . . . agreed to the entry of an order for . . . more restrictive involuntary mental health treatment." D.C. was transferred to Cascade Behavioral Health Hospital for involuntary treatment.

Petition for 90-Day Involuntary Treatment

On April 20, 2018, Cascade Behavioral Health Hospital designated professional and licensed clinical social worker Hyemin Song filed a petition for an additional 90-day

---

[1] Some boldface omitted.

2

order for involuntary treatment. The petition alleges D.C. is "gravely disabled."

The petition states D.C. suffers from schizophrenia "evidenced by disorientation, confusion, delusions, disorganized thoughts, tangential speech, and poor judgment." D.C.'s symptoms are "ongoing" even in a stabilized environment, he "has not engaged in discussing his treatment needs in a meaningful manner," and he "does not have safe and reasonable discharge options at this time." The petition states that were D.C. to leave the hospital prematurely, D.C. "would be at risk to harm himself due to an inability to take care for basic health and safety needs."

Appointment of Guardian ad Litem

On April 24, 2018, D.C.'s attorney filed a motion to continue the trial on the petition for a 90-day involuntary commitment order to seek the appointment of a guardian ad litem (GAL) for D.C. The court granted the motion.

The same day, the court entered an order appointing Elizabeth Walter as the GAL for D.C. under King County Local Mental Proceeding Rule (LMPR) 1.7.[2] A GAL is appointed "for the benefit of and to protect the rights and best interests" of D.C. In re Quesnell, 83 Wn.2d 224, 235, 517 P.2d 568 (1973). The order states the GAL shall be "permitted reasonable access" to D.C. "for the purpose of interviewing [him]" and to all

---

[2] LMPR 1.7 states:

(a) Appointment of a Guardian ad Litem. Upon representation by the respondent's counsel on the record that a Guardian ad Litem is needed in a case, the Court may appoint a Guardian ad Litem on behalf of the respondent without requiring the respondent to appear in court. The request for the appointment of a GAL shall be on the record with petitioner's counsel present. In the event the petitioner objects to the appointment of a Guardian ad Litem in the respondent's absence or if respondent's counsel requests, the Court may require the respondent to appear to allow the Court to conduct an inquiry with the respondent to determine that a Guardian ad Litem should be appointed.

(b) Discharge of a Guardian ad Litem. Upon representation by the respondent's counsel on the record that the Guardian ad Litem has concluded that his or her services are no longer necessary and that respondent's counsel has been able to communicate with the respondent, the Court may discharge the Guardian ad Litem.

(Boldface omitted.)

hospital records pertaining to his "current hospital stay." See RCW 70.02.230(2)(x)[3] ("Information and records related to mental health services . . . may be disclosed . . . [t]o the person's counsel or guardian ad litem, without modification, at any time in order to prepare for involuntary commitment.").

Trial on Petition for a 90-Day Involuntary Commitment Order

On April 30, 2018, the court entered an order scheduling a bench trial on the petition for a 90-day involuntary commitment order for May 10.

At the beginning of the May 10 trial, the prosecutor told the court this is an "uncontested hearing" on grave disability. Counsel for D.C. told the court the GAL "asked that this be a short hearing." The GAL waived her presence and D.C's presence to attend the trial and the court confirmed.

A person may be involuntarily committed for treatment of a mental disorder if, as a result of such disorder, he is gravely disabled. In re Det. of LaBelle, 107 Wn.2d 196, 201-02, 728 P.2d 138 (1986). RCW 71.05.020(22)(a)[4] defines "gravely disabled" as "a condition in which a person, as a result of a mental disorder, . . . [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." The State has the burden of proving a person is gravely disabled by clear, cogent, and convincing evidence. Labelle, 107 Wn.2d at 209.

> [T]he State must present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and

---

[3] We note the legislature amended RCW 70.02.230 several times since April 2018. LAWS OF 2018, ch. 201, § 8002; LAWS OF 2019, ch. 381, § 19; LAWS OF 2019, ch. 317, § 2; LAWS OF 2019, ch. 325, § 5020. Because the amendments do not change the language quoted here, we cite the current statute.

[4] We note the legislature amended RCW 71.05.020 several times since April 2018. LAWS OF 2018, ch. 201, § 3001; LAWS OF 2018, ch. 291, § 1; LAWS OF 2018, ch. 305, § 1; LAWS OF 2019, ch. 325, § 3001; LAWS OF 2019, ch. 444, § 16; LAWS OF 2019, ch. 446, § 2. Because the amendments do not change the definition of "gravely disabled," we cite the current statute.

medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded.

LaBelle, 107 Wn.2d at 204-05. "[T]he failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors." LaBelle, 107 Wn.2d at 205.

The State called clinical social worker Song as the only witness at trial. Song testified that she interviewed and evaluated D.C. and met with D.C. "multiple times, including today, this morning." Song testified that D.C. "has a mental disorder and working diagnosis at this time is schizophrenia," and his resulting cognitive and behavioral functions make him "gravely disabled." Song addressed D.C.'s schizophrenia:

> He is responding to auditory hallucination, responding to internal stimuli, and preoccupied. He tends to be very isolated and withdrawn . . . . He only comes out of the room when . . . it's alerted to him and reminded him for meal times. He's often very restless and anxious and requiring assurance from the staff, and most of the time that it doesn't work and then he requires a calming medication that are needed. He is not really in tune to what the basic needs that he needs to keep up with in the reality setting because he is too preoccupied.

Song testified that during her interviews with D.C., "[h]e presents as internally preoccupied responding to hallucination. He's at times restless and anxious and that he has slurred speech." Song testified that in her opinion, D.C. was at substantial risk of serious physical harm due to his inability to provide for his needs and safety. When Song asked D.C. that morning what he planned to do if released from the hospital, D.C. replied he would like to go to the Downtown Emergency Service Center (DESC) but could not say how he would do so or what he would do in case of an emergency, other than " 'walk to the emergency room.' " When Song suggested helping D.C. get benefits

and he stay in the hospital, he became "extremely agitated" and "incoherent and then delusional."

Song testified that in her opinion, D.C. was gravely disabled:

Due to [D.C.'s] internal preoccupation and disorganization, he's not able to effectively communicate with the other providers and the staff, even at Cascade, which is his structured environment. Outside of this structured environment, I would be concerned about him not being able to communicate his basic needs. I'm afraid that he's going to be in the same situation after decompensation where he shows up completely incoherent, incontinent of his bladder and bowel, and that he would ultimately be at risk at having infections or other medical needs that he had at the time of admission. He's a safety risk in that he's not in his own behavior control even though he has been able to maintain his behaviors in a hospital. But without the consistent structure to provide the medications and the treatment, I would be concerned about his safety outside of the setting.

In reaching her opinion, Song said she also considered medical chart notes and consulted with the treatment team. The State introduced entries from the Cascade Behavioral Health Hospital medical chart as business records. D.C.'s attorney stipulated to the admission of the medical records.

Song referred to the observations in the medical records that supported her opinion. An April 14, 2018 psychiatric evaluation by Dr. Long states, "Upon admission, [D.C.] remained disorganized, psychotic, agitated, with a loud speech. He believed that I was somebody from Olympia and he was very paranoid and guarded; did not want to speak with me." Song testified that Dr. Long noted D.C. "as suspicious." Song also referred to the most recent May 9, 2018 "psychiatric progress note" that describes D.C.'s behaviors and increasing his antipsychotic medication for "persistent psychosis." The chart note states D.C. "respond[s] to internal stimuli," "denies all psychotic symptoms," and when trying to elicit his thought process, he starts to "express very disorganized and delusional nonsensical thoughts." The final medical entry Song refers

to is a May 7, 2018 "[n]ursing progress note" detailing observations of D.C. That note describes D.C. "talking to self, laughing to self, [and] making nonsensical statements."

D.C.'s attorney did not cross-examine Song. The State waived closing argument and D.C.'s attorney waived closing argument.

The court ruled Song's testimony established by clear, cogent, and convincing evidence that D.C. was gravely disabled. The court entered an order for 90 days of involuntary treatment. The court also entered written "Supplemental Findings of Fact and Conclusions of Law Pursuant to LMPR 1.11."[5]

Appeal of 90-Day Involuntary Commitment Order

D.C. seeks reversal of the 90-day commitment order on the grounds that (1) his attorney provided ineffective assistance of counsel and (2) insufficient evidence supports finding he was gravely disabled.

Ineffective Assistance of Counsel

An individual subject to a civil commitment proceeding under chapter 71.05 RCW has the statutory right to effective assistance of counsel as analyzed under the ineffective assistance of counsel standard in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In re Det. of T.A.H.-L., 123 Wn. App. 172, 178-79, 181, 97 P.3d 767 (2004); see RCW 71.05.300 (statutory right to counsel in 90-day commitment proceedings).

---

[5] LMPR 1.11(b) states:

The Court shall enter supplemental written findings and conclusions in a case that is appealed to the courts of appeal. The findings and conclusions may be entered after the notice of appeal is filed. The prosecution must submit such proposed findings and conclusions, together with a copy of the taped report of proceedings, to the appropriate Judge or Commissioner, and opposing counsel of record within 21 days after receiving the respondent's notice of appeal.

Ineffective assistance of counsel claims present mixed questions of law and fact. State v. Lopez, 190 Wn.2d 104, 116, 410 P.3d 1117 (2018). "We review a trial court's factual findings made in the course of deciding an ineffective assistance issue for substantial evidence." Lopez, 190 Wn.2d at 116. The legal conclusions based on findings of fact for ineffective assistance of counsel claims are reviewed de novo. Lopez, 190 Wn.2d at 117. Strickland uses a two-pronged test for evaluating whether a defendant had constitutionally sufficient representation. State v. Estes, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). Under Strickland, D.C. must establish both (1) deficient performance and (2) resulting prejudice. Estes, 188 Wn.2d at 457-58.[6]

Performance is deficient if it falls " 'below an objective standard of reasonableness based on consideration of all the circumstances.' " Estes, 188 Wn.2d at 458 (quoting State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Prejudice exists if there is a reasonable probability that " 'but for counsel's deficient performance, the outcome of the proceedings would have been different.' " Estes, 188 Wn.2d at 458 (quoting State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). To prove prejudice, D.C. must show more than a "conceivable effect on the outcome" to prevail. Strickland, 466 U.S. at 693. "At the same time, a 'reasonable probability' is lower than a preponderance standard." Estes, 188 Wn.2d at 458. "Rather, it is a probability sufficient to undermine confidence in the outcome." Estes, 188 Wn.2d at 458.

---

[6] D.C. cites to the rule in United States v. Cronic, 466 U.S. 648, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), stating there are specific limited circumstances where the court does not apply Strickland and presumes prejudice from deficient performance. But the Supreme Court has applied the presumption-of-prejudice exception to Strickland in very few cases, most involving conflict of interests. Freeman v. Graves, 317 F.3d 898, 900 (8th Cir. 2003). The Cronic exception to proving prejudice under Strickland is not applicable here.

"Washington courts also indulge a strong presumption that counsel's representation was reasonable." Estes, 188 Wn.2d at 458. To rebut the presumption of reasonableness, a defendant must establish an absence of any legitimate trial tactic that would explain counsel's performance. In re Pers. Restraint of Lui, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). "Performance is not deficient if counsel's conduct can be characterized as legitimate trial strategy or tactics." Estes, 188 Wn.2d at 458.

An attorney's decision on whether and when to object to trial testimony are classic examples of trial tactics. In re Pers. Restraint of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). When a defendant bases his ineffective assistance of counsel claim on trial counsel's failure to object, the defendant must show the trial court would have sustained the objection and the result would have been different. Davis, 152 Wn.2d at 714.

D.C. contends his attorney provided ineffective assistance of counsel by stipulating to the admittance of medical records under RCW 5.45.020. The decision to admit or exclude business records will be reversed only if it was a manifest abuse of discretion. State v. Ziegler, 114 Wn.2d 533, 538, 789 P.2d 79 (1990). As provided in RCW 5.45.020, hearsay evidence contained in business records is competent evidence:

> A record of an act, condition or event, shall in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

Business records are presumptively reliable if they are made in the regular course of business and with no apparent motive to falsify. Ziegler, 114 Wn.2d at 537-38. Hospital records qualify as business records—" 'A practicing physician's records, made in the

9

regular course of business, properly identified and otherwise relevant, constitute competent evidence of a condition therein recorded.' " Ziegler, 114 Wn.2d at 538-39 (quoting State v. Sellers, 39 Wn. App. 799, 806, 695 P.2d 1014 (1985)).

Hospital records containing entries made by a variety of medical personnel may be testified to even if those authors are not present for cross-examination. Ziegler, 114 Wn.2d at 538. As the Ziegler court states:

> "As applied to hospital records, compliance with the [Uniform Business Records as Evidence Act, chapter 5.45 RCW,] obviates the necessity, expense, inconvenience, and sometimes impossibility of calling as witnesses the attendants, nurses, physicians, X ray technicians, laboratory and other hospital employees who collaborated to make the hospital record of the patient. It is not necessary to examine the person who actually created the record so long as it is produced by one who has the custody of the record as a regular part of his work or has supervision of its creation."

Ziegler, 114 Wn.2d at 538 (quoting Cantrill v. Am. Mail Line, Ltd., 42 Wn.2d 590, 608, 257 P.2d 179 (1953)). Indeed, even a provision in the civil commitment statute explicitly anticipates this issue and provides:

> The record maker shall not be required to testify in order to introduce medical or psychological records of the detained person so long as the requirements of RCW 5.45.020 are met except that portions of the record which contain opinions as to the detained person's mental state must be deleted from such records unless the person making such conclusions is available for cross-examination.

RCW 71.05.360(9).[7] Because the record establishes Song is the custodian of the medical records and relies on them in forming her opinion, the records are admissible.

---

[7] We note the legislature amended RCW 71.05.360 in 2019. LAWS OF 2019, ch. 446, § 13. The amendments do not change subsection (9).

D.C. relies on In re Welfare of J.M., 130 Wn. App. 912, 125 P.3d 245 (2005), to argue the business record exception does not apply.[8] J.M. is distinguishable. In J.M., the court held that the failure of counsel to object to the admission and testimony of witnesses who were not experts about psychological evaluations that contained opinions of witnesses who did not testify was deficient performance. J.M., 130 Wn. App. at 916-25. Here, unlike in J.M., the undisputed record shows Song referred only to objective facts and observations contained in the medical records that supported Song's expert opinion that D.C. was gravely disabled. D.C. cannot show his counsel was deficient for stipulating to admissible medical records under the business records exception.

D.C. also asserts his attorney provided ineffective assistance of counsel by not cross-examining Song, not calling witnesses, and not giving an opening or closing statement.

"Generally the decision whether to call a particular witness is a matter for differences of opinion and therefore presumed to be a matter of legitimate trial tactics." Davis, 152 Wn.2d at 742. D.C. also does not identify any particular witness he claims his attorney should have called to testify. State v. Davis, 174 Wn. App. 623, 639, 300 P.3d 465 (2013).

Likewise, an attorney's decision to forgo an opening or closing statement is a matter of tactics. Davis, 152 Wn.2d at 715; State v. Jones, 33 Wn. App. 865, 872, 658 P.2d 1262 (1983).

---

[8] D.C. also cites In re Dependency of G.A.R., 137 Wn. App. 1, 8-9, 150 P.3d 643 (2007), which follows J.M. and holds defense counsel was ineffective for failing to object to evidence, including reports written by experts who did not testify.

"The extent of cross-examination is a matter of judgment and strategy" as well. State v. Johnston, 143 Wn. App. 1, 20, 177 P.3d 1127 (2007). "Moreover, in order to establish prejudice for the failure to effectively cross-examine a witness, the defendant must show that the testimony that would have been elicited on cross-examination could have overcome the evidence against the defendant." Johnston, 143 Wn. App. at 20.

The undisputed record shows the GAL waived her presence and the presence of D.C. and decided to proceed with an uncontested "short hearing" that required the State to prove by clear, cogent, and convincing evidence D.C. was gravely disabled. D.C. cannot show that his counsel was deficient on any of these other allegations of ineffective assistance of counsel because they were legitimate trial tactics.

Sufficiency of the Evidence

D.C. contends the findings of fact based on Song's testimony and the medical records do not establish D.C. was gravely disabled under RCW 71.05.020(22) and the 90-day commitment was warranted.

The burden of proof at a 90-day involuntary commitment trial is "clear, cogent, and convincing evidence." LaBelle, 107 Wn.2d at 209. Accordingly, "the ultimate fact in issue must be shown by evidence to be 'highly probable.' " LaBelle, 107 Wn.2d at 209 (quoting In re Pawling, 101 Wn.2d 392, 399, 679 P.2d 916 (1984)). When the trial court has weighed the evidence, this court limits its review to determining whether substantial evidence supports the trial court's findings and, if so, whether the findings in turn support the trial court's conclusions of law and the judgment. LaBelle, 107 Wn.2d at 209; In re Det. of W.C.C., 193 Wn. App. 783, 793, 372 P.3d 179 (2016). "Substantial evidence is 'evidence in sufficient quantum to persuade a fair-minded person of the

12

truth of the declared premise.' " In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998) (quoting Holland v. Boeing Co., 90 Wn.2d 384, 390-91, 583 P.2d 621 (1978)). "The party challenging a finding of fact bears the burden of demonstrating the finding is not supported by substantial evidence." A.S., 91 Wn. App. at 162. The court defers to the trial court as to the credibility of the witnesses and the weight of the evidence. In re Vulnerable Adult Petition for Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014). "An appellate court will uphold challenged findings of fact and treat the findings as verities on appeal if the findings are supported by substantial evidence." In re Estate of Jones, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

The supplemental findings and conclusions state, in pertinent part, "[D.C.] currently suffers from a mental impairment and has been diagnosed as suffering with schizophrenia. . . . [D.C.]'s mental impairment has had a substantial adverse effect upon his cognitive and volitional functions." The court found that as a result of his mental impairment, D.C. was gravely disabled and at "substantial risk of harm due to his inability to provide for his own essential needs of health and/or safety." The findings also state D.C.

> exhibits active symptoms of his mental impairment including but not limited to presenting with an inability to communicate effectively, including the inability to communicate his own needs, being incoherent, confused, disorganized, agitated, experiencing and expressing delusional thought process, experiencing hallucinations, and exhibiting preoccupation.

The court found that without further treatment,

> [D.C.] will continue in the condition that brought him into hospital and that a less restrictive treatment alternative is not appropriate nor in [D.C.]'s best interest because he is not stabilized, exhibits active symptoms of his mental impairment, and [D.C.] continues to be too disorganized and too symptomatic to comply with a less restrictive treatment order at this time.

The court concluded the State "established by clear, cogent, and convincing evidence that [D.C.] suffers from a mental impairment that has had a substantial adverse effect on his cognitive and volitional functions; and **as a result of this mental impairment** [D.C.] is gravely disabled pursuant to" RCW 71.05.020(22).[9]

D.C. argues that because this was the first time he was hospitalized for his mental health and was stable after his initial treatment, the court lacked evidence that he was gravely disabled. D.C. contends he devised a safe and reasonable discharge plan in that he wanted to take a bus to DESC for services and his most recent hospital record indicated he was eating, adequate with his hygiene, and compliant with his care plan, which proved he was not at risk of harm for failing to provide for his essential human needs. The record does not support his argument.

Song provided overwhelming evidence that supplemented her expert opinion that D.C. was gravely disabled. Song testified that because of D.C.'s schizophrenia, he suffers from ongoing disorganization, incoherence, and extreme agitation despite being in the stable hospital environment. Song further testified that D.C. was not aware of his basic needs due to being "too preoccupied" and having "poor insight." Song was also concerned that D.C. was not able to state a reasonable self-care plan because in addition to D.C. not being able to articulate how he would arrange transportation to DESC, he also could not describe how he would ensure his personal safety in case of an emergency. Song concluded that if D.C. did not receive further treatment, he would likely end up back in the hospital in the same condition that brought him there—being unable to communicate and care for his basic needs and in poor physical health. The

---

[9] Boldface in original.

trial court ultimately found the testimony of Song "credible" and incorporated her testimony by reference in its supplemental findings of fact and conclusions of law.

Substantial evidence supports the findings of fact and the findings support the conclusion that D.C. demonstrated grave disability. We affirm.

WE CONCUR: